```
                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


     KIMBERLY PASSANANTI,                 )
                                          )
                         Plaintiff,       )
                                          )
                                          )
     -vs-                                 )   Case No. 08 C 2803
                                          )
                                          )   Chicago, Illinois
     THE COUNTY OF COOK, ILLINOIS,        )   June 7, 2010
     a unit of local Government,          )   1:00 o'clock p.m.
     COOK COUNTY SHERIFF'S                )
     DEPARTMENT, JOHN P. SULLIVAN,        )
     in his individual capacity,          )
                                          )
                         Defendants.      )


                              VOLUME 1
                     TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JOHN W. DARRAH

     APPEARANCES:

     For the Plaintiff:        ANDREOU & CASSON, LTD.
                               BY:  MR. LUKE A. CASSON
                               661 West Lake Street
                               Suite 2N
                               Chicago, Illinois 60661

     For the Defendants:       COOK COUNTY
                               STATE'S ATTORNEY'S OFFICE
                               BY:  MR. DONALD R. HALLSTEN, JR.
                                    MR. JAMIESON BRENT BOWMAN
                               500 Richard J. Daley Center
                               Chicago, Illinois 60602



                           Mary M. Hacker
                        Official Court Reporter
                     United States District Court
              219 South Dearborn Street, Suite 1212
                       Chicago, Illinois  60604
                     Telephone:  (312) 435-5564
```

```
 1              (Jury entered the courtroom.)
 2                   THE COURT:  Good afternoon, ladies and gentlemen.
 3                   Plaintiff ready to proceed?
 4                   MR. CASSON:  We are, your Honor.
 5                   THE COURT:  Defense ready to proceed?
 6                   MR. BOWMAN:  We are, your Honor.
 7                   THE COURT:  Do you wish to make an opening
 8      statement, Mr. Casson?
 9                   MR. CASSON:  I do, your Honor.
10                   THE COURT:  You may proceed.
11              OPENING STATEMENT ON BEHALF OF THE PLAINTIFF
12                   MR. CASSON:  "The longer I work for anything, the
13      sensation increases for what I work."  It's an interesting
14      quote about work and the meaning of work.  And in the end,
15      that's what this case is going to be about.  It's about a
16      woman who valued her work because it was her career.
17                   It's about a woman who sought out a particular kind
18      of work, sought out a particular kind of education in order
19      to do her work.
20                   This is a case about Kim Passananti.  This is Kim's
21      life's work.  She worked at a place called the Day Reporting
22      Center.  You will hear a lot about that in this case.
23                   The Day Reporting Center is part of the Cook County
24      Sheriff's Department.  What they do at the Day Reporting
25      Center is they take inmates, some who are in the jail, some
```

 1   who are on electronic monitoring.  These are diversion

 2   programs to reduce overcrowding.  It's one of the goals of

 3   the Day Reporting Center.

 4              What the Day Reporting Center ultimately does is,

 5   they try to rehabilitate those they think can be

 6   rehabilitated, non-violent offenders, low bond detainees.

 7              Kim was part of the Day Reporting Center.  She

 8   spent a life of work at the Day Reporting Center.

 9              In 1994 she began her work.  She started out at the

10   bottom, she worked up as an investigator, received promotion

11   after promotion after promotion until she was then the deputy

12   director.

13              It was at the time she became deputy director that

14   she began to receive some problems, problems that the

15   evidence will show were generated by Mr. Sullivan.  You will

16   hear him referred to as John Sullivan, Pat Sullivan or

17   Director Sullivan.

18              Also, unfortunately, what you will hear in this

19   case is some vulgar, sometimes foul language that was used to

20   understand that this is the basis of what Ms. Passananti

21   complained about.

22              The evidence that you will hear over the course of

23   this next week will describe the manner in which those

24   vulgarities were delivered to her, in what manner and how

25   frequent, that she was called a bitch, that she was accused

Casson - opening

1   of lying, she was accused of having sexual relations with

2   inmates.

3          Now, at the same time Ms. Passananti will testify

4   very shortly that she complained about these incidents.  She

5   complained not to one person, not to two, but to three and

6   wrote a letter.  Nothing was ever done about that, but she

7   was suspended.  She's accused of wrongdoing along with three

8   other males.  The other three males who were accused of

9   wrongdoing were all let off the hook but Ms. Passananti was

10  not.  You will hear evidence that that is because the Cook

11  County Sheriff's Department based its decisions on her

12  gender.  This is how they treat women.

13         Our case is about how both Kim and other women were

14  treated at the Day Reporting Center.

15         Ultimately you will hear some evidence from the

16  defendants.  They don't believe that this is related to

17  gender.

18         There will be testimony from Alexis Herrera, who is

19  a budget analyst.  You will hear her explain that Ms.

20  Passananti was subject to termination because of the budget

21  cuts.  You will hear a lot about budget cuts in this case.

22  Our contention is that no such thing ever happened.

23         You will hear testimony that those budget cuts

24  eliminated one position.  It eliminated Kim's position and it

25  eliminated Kim.

1    You will hear evidence that all of the other people
2    that they say were eliminated never lost their jobs.

3         You will hear evidence that another woman who they
4    say was eliminated was never eliminated and retired two years
5    later, full pension, who was also a friend of the Sheriff.

6         We ask only that you keep an open mind as to this
7    particular kind of defense.

8         We will present evidence to you that suggests that
9    there was no budget problem, that a budget that eliminates
10   one position and reduces nobody's salary -- nobody's bottom
11   line on a unit basis is illusory; it didn't happen.  They
12   were shuffling the cards on the budget.

13        We will ultimately have an opportunity to talk
14   again at the end of the case.  I just want to give you an
15   overview about what this case is going to be about, what kind
16   of evidence you're going to hear.

17        I don't want you to be shocked when you hear the
18   vulgarities coming out of witnesses on that stand.  I'm going
19   to be asking those questions and I'm going to ask them to
20   tell you exactly what happened.

21        Those folks, some of which work at the DRC, some of
22   them may not work at the DRC any more, but they all have
23   something to tell you about what happened at the DRC.

24        Keep an open mind until we're at the end of the
25   case and we've got all of the evidence in.  That's all we ask

 1   of you.  Keep an open mind and be fair.

 2              On behalf of Kim and myself, thank you.

 3              THE COURT:  Thank you, Mr. Casson.

 4              Mr. Bowman, do you wish to make an opening

 5   statement?

 6              MR. BOWMAN:  Yes, your Honor.

 7              OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

 8              MR. BOWMAN:  Ladies and gentlemen of the jury, Ms.

 9   Passananti filed her complaint alleging harassment almost a

10   year and eight months after it happened.  She filed the

11   complaint after she lost her job due to budget cuts.  Those

12   are the facts.  That is what you will hear.

13              Ms. Passananti did work for Mr. Sullivan.

14   Mr. Sullivan is sitting at defense counsel's table right

15   there.

16              Mr. Sullivan, will you stand up, please?

17      (Defendant complied.)

18              MR. BOWMAN:  Thank you, Mr. Sullivan.

19              Mr. Sullivan was her supervisor in 2005, and Ms.

20   Passananti is going to allege that she was called a bitch.

21   Mr. Sullivan is going to explain to you that did not happen.

22              Ms. Passananti did not make an allegation, a

23   complaint, with the Sheriff, or the EEOC or the state court

24   all throughout 2005.  She didn't make a complaint in 2006.

25              When Mr. Sullivan was working at the DRC -- and the

1    DRC is an acronym for the Day Reporting Center -- there were

2    no other allegations by Ms. Passananti after the first one.

3    There were no other allegations about Mr. Sullivan from

4    anyone else in the Day Reporting Center, which is the DRC.

5         Mr. Sullivan in approximately July of 2006

6    experienced some medical problems and he had to leave work

7    and he never came back.  You'll hear that Ms. Passananti was

8    the acting -- or director of the Day Reporting Center during

9    that time.  When Mr. Sullivan left Ms. Passananti did not

10   file a complaint with the Sheriff or anyone else.

11        Again, Ms. Passananti filed a complaint with the

12   EEOC May 1st of 2007, a year-and-a-half afterwards.  And what

13   happened prior to that?

14        Cook County was experiencing a budget cut.  You'll

15   hear terms like reduction in force, you'll hear budget cuts,

16   you'll hear layoffs.  Those are all part and parcel of the

17   same event which Cook County had to reduce costs.

18        And you'll hear from someone called -- named Alexis

19   Herrera.  And Ms. Herrera was a budget analyst for Cook

20   County.  Her job was to reduce the budget.

21        Now, Ms. Herrera will tell you that the first

22   budget submission, the Sheriff wanted all positions at the

23   DRC to be funded.  He wanted everybody to keep their job, and

24   that was the recommendation to the Sheriff.  That didn't end

25   up happening.

1          The budget measures that they wanted to enact,

2   which is essentially a budget reduction of about $3 million,

3   the County Board rejected.  And there was an amendment

4   saying, you've got to cut filled positions, you've to cut

5   personnel.  And Ms. Herrera, because of her experience, her

6   knowledge with -- about the workings of the Day Reporting

7   Center, her knowledge of the workings of the Sheriff, was

8   tasked with making a reduction, and that reduction was

9   personnel.  Ms. Passananti's position ended up being one of

10  those positions.

11         And Ms. Herrera will explain to you, she did the

12  best she could to figure out what positions could be

13  eliminated without affecting the census population at the

14  jail, because you couldn't reduce anything that would

15  increase jail overcrowding.  And the Day Reporting Center was

16  the place that that cut had to be made.  Ms. Passananti lost

17  her job.

18         You'll also hear that Ms. Passananti knew very well

19  of the Sheriff's harassment policy, that she understood that

20  she needed to make a complaint.  She didn't make one.

21         When Judge Darrah reads the jury instructions,

22  you'll hear that if a plaintiff unreasonably fails to take

23  advantage of defendant's harassment policy, you must find for

24  the defendant.

25         You'll also hear from an individual -- two

Bowman - Opening

1    individuals, Tony Boyle and Richard LaBrie, who are currently

2    at the Day Reporting Center.  Mr. Boyle is going to explain

3    to you that he is -- and you're going to hear some talk about

4    grades; those are ranks of your employment -- he's going to

5    say that he is a grade 20.  You're going to hear from Ms.

6    Passananti and others that Ms. Passananti's position was a

7    grade 23.

8              Plaintiffs are going to try to tell you that

9    Anthony Boyle is the deputy director of Day Reporting and

10   that the position is still there.  Ms. Herrera, Mr. Boyle and

11   Mr. LaBrie are all going to say he is not officially the

12   director -- the deputy director of the Day Reporting Center.

13   There is no budgeted slot -- and Ms. Herrera is going to

14   testify -- even currently there is no budgeted slot for

15   deputy director of Day Reporting Center.

16             What you will hear from Mr. LaBrie is that Mr.

17   Boyle was the acting director when all of the budget cuts at

18   Day Reporting occurred.  He -- somebody had to continue to

19   run the place.  That was -- he got assigned that task.

20             When Mr. LaBrie was hired, you have two people who

21   are now apparently the director, and two people couldn't be

22   the director.  So Mr. Boyle, at Mr. LaBrie's direction,

23   assumed some sort of a deputy role.  But he was not paid as a

24   deputy director.  And despite any title, there is no budgeted

25   slot for deputy director of the Day Reporting Center.

```
 1              At the end of this case we will ask you to find for
 2   the defendants, stating that there is no fault in the
 3   termination of Ms. Passananti, that her job was cut,
 4   unfortunately, due to budget cuts, and that there was no
 5   harassment demonstrated by her failure to complain.
 6              Thank you.
 7              THE COURT:  Thank you, Mr. Bowman.
 8              Would you call your first witness please, Mr.
 9   Casson?
10              MR. CASSON:  Yes, your Honor.  Plaintiff calls Kim
11   Passananti.
12      KIM PASSANANTI, CALLED IN HER OWN BEHALF, DULY SWORN
13              THE COURT:  You may inquire.
14              MR. CASSON:  Thank you, your Honor.
15                        DIRECT EXAMINATION
16   BY MR. CASSON:
17   Q.   Kim, introduce yourself to the jury, please.
18   A.   Good afternoon, ladies and gentlemen.  I'm Kim
19   Passananti.  And I'm here because I was discriminated against
20   with the Cook County Sheriff's Department because I was a
21   woman.
22   Q.   Kim, I want to talk to you a little bit about your
23   background.
24              Are you married?
25   A.   Yes, I am.
```

1    Q.    And who are you married to?

2    A.    I'm married to Joe Passananti.

3    Q.    Do you have children?

4    A.    Yes, I do.

5    Q.    How many children do you have?

6    A.    I have two children.

7    Q.    What are their names?

8    A.    Becky is my daughter; she's 29 years old.  And Danny is

9    my son; he's 25 years old.

10   Q.    Describe your relationship with your daughter?

11   A.    We have a wonderful relationship.  Becky is my best

12   friend.

13   Q.    Does she currently reside with you?

14   A.    No, she does not.

15   Q.    When did she move out of your house?

16   A.    She moved out approximately two years ago.  She bought a

17   townhouse.

18   Q.    And what year did she move out?

19   A.    She moved out in 2008.

20   Q.    In 2008 -- or up to 2008 where were you employed?

21   A.    I was employed up until 2007 with the Cook County

22   Sheriff's Department.

23   Q.    Were you -- and subsequent to that was she still living

24   with you?

25   A.    Yes, she was.

1    Q.   Tell us something a little bit about your educational
2    background?
3    A.   In 1993 I graduated from St. Xavier's University with my
4    undergraduate degree in clinical psychology in criminal
5    justice, and in 1995 I graduated from Lewis University with a
6    graduate degree in criminal psychology.
7    Q.   Why did you choose those courses of study?
8    A.   Because my career was vested in the criminal justice
9    system and helping individuals that were in the system.
10   Q.   What do you mean it was vested?
11   A.   That is -- that was my whole goal.  My whole goal of my
12   career was to be involved in helping people that were
13   involved in the criminal justice system.
14   Q.   And had you been involved in the rehabilitative justice
15   system prior to 1993?
16   A.   Yes, I was.
17   Q.   Explain to us how that was?
18   A.   I worked for TASC, which stands for Treatment
19   Alternative for Special Clients.  And I was a drug and
20   alcohol evaluator, and I was an advocate in the courts for
21   individuals that were in the system and were experiencing
22   drug and alcohol issues, getting them rehabilitated.
23   Q.   When you say advocate, what were you there to do, to get
24   them out of trouble?
25   A.   No, no, no.

1  Q.   Explain what that means.

2  A.   It was to take an individual that wasn't given the tools

3  originally to do something positive with their lives and, you

4  know, ended up in a criminal system, and get them the help

5  they needed, get them drug and alcohol counseling, get them

6  educational components, and just taking them and giving them

7  tools that they needed in order to change their lives.

8  Q.   And when you first started school, were you also working

9  for TASC?

10  A.   In -- when I was in undergraduate school?

11  Q.   Yes.

12  A.   No, I was not.

13  Q.   When did you go to school?

14  A.   I --

15  Q.   I mean, what kind of -- did you go during the day or at

16  night?

17  A.   Yes, I went during the day.  I was raising my children

18  and I was going to school at the same time for my

19  undergraduate degree.  When I graduated with my undergraduate

20  degree is when I went to work for TASC.

21  Q.   And how long did you work for TASC?

22  A.   A little over a year.

23  Q.   During that time that you were with TASC, how did you

24  receive clients or people that you would administer your

25  services to?

1   A.   I went to the courts.  They were court-ordered to get a

2   TASC evaluation.  And what that is, the courts deemed that

3   this individual, based on their criminal background and maybe

4   the escalation of their criminal background, be it, you know,

5   possession of a controlled substance a couple of times, they

6   determined that if this individual has said, yes, they do

7   have a drug addiction or an alcohol addiction, they were

8   allowed an evaluation.  And I would get them through the

9   court system.  I would go into the jail if they were housed

10  in the jail, or I would interview them on site for a drug and

11  alcohol evaluation.

12  Q.   What was the purpose of giving them a drug and alcohol

13  evaluation?

14  A.   Rehabilitative.  It was strictly to assist them in

15  rehabilitative services.

16  Q.   Is this something the Court would order?

17  A.   The Court would order the evaluation, and then they

18  would go on probation -- these individuals were probationable

19  and they would receive probation, and a condition of their

20  probation would be to follow all of the recommendations based

21  on their TASC evaluation.

22  Q.   And did you receive any certifications or any special

23  training on your advocacy duties at TASC?

24  A.   Yes.

25  Q.   What kind of certifications do you need to do that?

1    A.    TASC trained us, you know, individually, to be drug and
2    alcohol evaluators.
3    Q.    What kind of training?  What kind of certifications
4    would you need?
5    A.    It was a 30-page document based on their social
6    background, their socioeconomic ability, their educational
7    ability, and we learned how to evaluate it.  And it was all
8    based on a point system, and based on the point system is
9    where we made our determination.  So we were trained on the
10   evaluative tool.
11   Q.    And would you -- did that require you to receive a
12   certificate of having trained in that particular area?
13   A.    Yes.  I received it from TASC.
14   Q.    Did you serve any internships both while you were in
15   school and shortly after you graduated?
16   A.    Yes.  Undergraduate, I did about 300 hours at Christ
17   Hospital on the psychiatric unit, in the intensive treatment
18   area.  In graduate school I did a little over a thousand
19   hours with an independent psychologist that -- their main
20   objective was reintegration and rehabilitative services for
21   people that were coming out of prison or were involved in the
22   pretrial status.
23   Q.    How was it that you used that training or those -- what
24   you learned in those internships in your work at TASC and
25   later with the Cook County Sheriff's Department?

1    A.   I used all of the tools that I got from both my

2    undergraduate degree and my graduate degree, my internships

3    and TASC -- they were all based on the same concept.  They

4    were rehabilitative in nature.

5    Q.   Why did you pursue these internships?

6    A.   They were part of my education.  They were a requirement

7    of my education, of graduating.

8    Q.   And ultimately what was your intent with following this

9    course of education?

10   A.   I truly wanted to be a part of change, of systemic

11   change in the justice system.  I wanted to be an advocate, to

12   be a help in the system where people were caught up in it,

13   they weren't given the opportunity to make changes in their

14   lives.

15   Q.   And at this time was there a thing called the -- or an

16   entity called the Day Reporting Center?

17   A.   Yes, there was.

18   Q.   Did you know about it?

19   A.   I found out about it while I was working at Bridgeview

20   courthouse for TASC.

21   Q.   What kind of courthouse, or where?

22   A.   Bridgeview.  It's the 5th District criminal court

23   building.

24   Q.   And where is that?

25   A.   In Bridgeview, Illinois.

1    Q.    Southwest of the city?

2    A.    Yes, southwest of the city.

3    Q.    And when you learned that there was a Day Reporting

4    program, what did you do to pursue that?

5    A.    I started asking around and I -- to find out about the

6    program.  It just sounded -- it was ideal.  It was -- it was

7    everything that I would have wanted.

8              I started asking around and I got -- accumulated as

9    much information as I possibly could about the program.

10   Q.    And ultimately did you pursue employment?

11   A.    Yes, I did.

12   Q.    And who did you pursue it with?

13   A.    It was a friend of the family I talked to and asked if

14   there was any way that I could give him my resume and

15   possibly be considered for employment.

16   Q.    And who was that friend?

17   A.    That was Marty Walsh.

18   Q.    And he worked for the Sheriff's Department?

19   A.    Yes, he did.

20   Q.    And ultimately were you hired?

21   A.    Yes, I was.

22   Q.    And what was your first position?

23   A.    I was an investigator.

24   Q.    When was this?  When did you first become an

25   investigator?

1   A.   I -- June of 1994.

2   Q.   When was -- if you know, when was this program begun,

3   the Day Reporting program?

4   A.   I believe it started in 1993.  I believe that that was

5   when it was first started.

6   Q.   Now, when you came on board, you became employed in the

7   Day Reporting Center, how many participants in the program

8   were there?

9   A.   There were 95 participants in Day Reporting originally.

10  Q.   Explain how the program progressed through the years up

11  until the time you left?

12  A.   Well, the program was based on the pretrial detainees

13  that are awaiting trial, and we -- I was very instrumental in

14  helping the program grow.

15       When I finally -- in 2007 we had approximately -- a

16  little over 600 -- between 600 and 700 participants in the

17  program.

18  Q.   From 95?

19  A.   Yes, from 1995.

20  Q.   I'm sorry, from 1995 or from 95 participants?

21  A.   From 95 participants to when I was fired in 2007 there

22  was approximately between 600 and 700 participants in the

23  program.

24  Q.   Was that the intent?

25  A.   Yes.

1  Q.   Why?

2  A.   Well, the program served a lot of different purposes.

3  The Cook County Jail was grossly over-populated.

4          Previous to the alternative programs, what was

5  happening in Cook County Jail is, they were -- the inmates

6  that were coming in were being -- were receiving an I-bond.

7  And an I-Bond is a bond that is -- you are released on your

8  own recognizance.

9          The Sheriff, when he created these programs, he

10  allowed for -- they were Sheriff's I-bonds and they were

11  attached to alternative programs.  So the more people that we

12  got into the program, the more people we could help -- we

13  could help not revisit the criminal justice system.

14  Q.   What's a bench warrant?

15  A.   A bench warrant is when somebody fails to appear in

16  court and then the judge issues the bench warrant.

17  Q.   To do what?

18  A.   To go and apprehend the person that didn't appear in

19  court and subsequently reincarcerate them.

20  Q.   Did those bench warrants play any factor into the Day

21  Reporting program?

22  A.   Absolutely.

23  Q.   How?

24  A.   What was happening was, if -- when these inmates were

25  given an I-bond, they were let out and they were not

1    supervised.  So subsequently, you know, they wouldn't come to
2    court, or they would pick up another case and they would --
3    the bench warrant issue was completely out of control.  There
4    was a massive amount of bench warrants that were being issued
5    because of those.
6    Q.    And what was the directive within the department to
7    address that?
8    A.    To get some alternative programs in place.
9    Q.    Were there any other alternative programs within the
10   Sheriff's Department?
11   A.    The other programs that were all -- they -- we were all
12   housed under DCSI, and what that is is the Department of
13   Community Supervision and Intervention.  It was Day
14   Reporting, it was electronic monitoring, it was the Sheriff's
15   Work Alternative Program, which is SWAP, and it was the
16   pre-release center.
17   Q.    And Day Reporting then was one of several alternatives?
18   A.    Yes, Day Reporting was one of four.
19   Q.    What was the interplay between the electronic monitoring
20   unit and the Day Reporting unit?
21   A.    The participants that we brought into the Day Reporting
22   program previously were on electronic monitoring, and they
23   spent, you know, different amounts of time, but they spent
24   time on electronic monitoring.  And then after we looked at
25   their rap sheet, which is their criminal background sheet, we

1    would then take them into Day Reporting and would -- we would

2    take off their bracelet and they would be in Day Reporting.

3    Q.   Were those two programs developed -- or implemented, I

4    should say, to address different kinds of -- or levels of

5    problems with inmates?

6    A.   Yes.

7    Q.   Explain how that is.

8    A.   Electronic monitoring was developed specifically as a

9    detainment.  The individuals that were on electronic

10   monitoring were being detained.  They were in their homes,

11   they were -- they wore a bracelet and they couldn't go with

12   -- you know, go 50 feet or a hundred feet from the monitoring

13   device.  Day Reporting was rehabilitative.  That was the goal

14   of Day Reporting.

15   Q.   Were detainees in the electronic monitoring unit

16   transferred into Day Reporting?

17   A.   Yes, they were.

18          THE COURT:  Let me see you at sidebar, please, off

19   the record.

20       (Sidebar discussion had off the record.)

21   BY MR. CASSON:

22   Q.   Kim, did individuals who came into the Day Reporting

23   program have to also be on electronic monitoring?

24   A.   No, they did not.

25   Q.   Why?

1   A.   It was progressive rehabilitation.  They were completely

2   separate entities.  Electronic monitoring was electronic

3   monitoring and Day Reporting was Day Reporting.

4        What the goal was, was to get the person into Day

5   Reporting for rehabilitative services, and that allowed

6   electronic monitoring -- to get another individual out of

7   Cook County Jail and put on to electronic monitoring.

8   Q.   Okay.  Ultimately you were promoted from investigator,

9   correct?

10  A.   Yes.

11  Q.   And what were you promoted to?

12  A.   I was promoted to deputy chief.

13  Q.   Now, what did you do as deputy chief?

14  A.   I had five investigators that I supervised, and I took

15  on more administrative roles.

16        THE COURT:  When did that occur?

17        THE WITNESS:  That occurred in '96, I believe, your

18  Honor.

19        THE COURT:  Thank you.

20  BY MR. CASSON:

21  Q.   And what was your title then?

22  A.   I was deputy chief.

23  Q.   Okay.  Later on you were promoted a second time?

24  A.   Yes, as chief.

25  Q.   All right.  And when was that?

1    A.   That was approximately two years later.

2    Q.   Approximately what year?

3    A.   Approximately 1998.

4    Q.   And when you were a chief did your duties change at all?

5    A.   No, they did not.

6    Q.   Did you supervise other people?

7    A.   Yes.

8    Q.   During this period of time did you also have any duties

9    at the training institute?

10   A.   Yes, I did.

11   Q.   What why were your duties at the training institute?

12   A.   I would train the new recruits that were coming in

13   through -- as correctional officers.  I trained them in human

14   behavior, in corrections.

15   Q.   Who hired you to do that?

16   A.   I submitted a resume to the director of the training

17   academy at the time; I think his name was Jerry O'Sullivan.

18   Q.   Did you have any other teaching duties anywhere else?

19   A.   Yes, yes.

20   Q.   Where?

21   A.   In 1995 I was hired by Moraine Valley Community College

22   as -- I was an adjunct professor.

23   Q.   And do you continue to be an adjunct professor to this

24   day?

25   A.   Yes, I do.

1    Q.   Do you know Alexis Herrera?

2    A.   Yes, I do.

3    Q.   And do you know Carmelita Wagner?

4    A.   Yes, I do.

5    Q.   How do you know Carmelita?

6    A.   I knew Carmelita through working with the Sheriff's

7    Department.  I met her many years ago when she was Sheriff

8    Sheehan's secretary.  I knew her as -- she was the director

9    of the DARE program through the Sheriff's Department and I

10   knew her for many years.

11   Q.   Was she in any way related to the training institute?

12   A.   Yes.  She was -- she got promoted and she was the

13   director -- the executive director of the training institute

14   of the Sheriff's Department.

15   Q.   When did she leave the employ of the Sheriff?

16   A.   I believe she left in late 2009.

17   Q.   Did you ever have any conversations with her about what

18   was happening in your unit with you, in the DRC?

19   A.   Yes, I did.

20   Q.   We will get back to that in a second.

21        Do you also know Alexis Herrera?

22   A.   Yes, I do.

23   Q.   Where did you meet her?

24   A.   I met her at the training academy.  She would be out

25   there occasionally when I was there training, when I was

1    teaching the recruits, and we spent a lot of time talking to

2    each other.

3    Q.    And when did you meet her?

4    A.    I believe I met her probably in 1998, somewhere right

5    around there.

6    Q.    Did you ever have any conversations with her at the

7    training institute?

8    A.    Yes, yes.  We had at length conversations because there

9    was a time that Alexis was very troubled because she worked

10   downtown and -- for the Sheriff's Department, and there was a

11   time that there was a transition going on at the Sheriff's

12   Department and one of the accountants that was at DCSI was

13   going to be transferred downtown, and Alexis had told me that

14   she was going to have to leave her position with the

15   Sheriff's Department and go to the county, Cook County,

16   because the man that was coming down there despised her.

17   Q.    And when did she tell you that?

18   A.    She told me that one day when we were at the academy.

19   I'm not sure of the year.

20   Q.    Where were you at the time?

21   A.    Oh.  We were standing outside of building A at Moraine

22   Valley.  We were standing outside and I was having a

23   cigarette and we were talking.

24   Q.    What position did you hold with the Sheriff's Department

25   at the time?

1    A.    I believe I was a deputy chief at the time.

2              THE COURT:  Do you recall when this took place?

3              THE WITNESS:  Your Honor, I'm not sure of the year.

4              THE COURT:  Your best recollection?

5              THE WITNESS:  Best recollection would be maybe

6    1998, maybe '99.

7    BY MR. CASSON:

8    Q.    Kim, there came a time when you became deputy director

9    of the DRC, correct?

10   A.    Yes.

11   Q.    How was it that you became deputy director?

12   A.    Both the director and the deputy director that were at

13   Day Reporting at the time both retired.

14             THE COURT:  When was that, please?

15             THE WITNESS:  That was in 2002, your Honor.

16   BY MR. CASSON:

17   Q.    Prior to that time -- or at around that time did you

18   provide any testimony in a case that related to the Sheriff's

19   Department?

20   A.    Yes, I did.

21   Q.    And what kind of case was that?

22   A.    It was a sexual harassment case.

23   Q.    And did it also involve Day Reporting Center personnel?

24             MR. HALLSTEN:  Objection, your Honor.

25             THE COURT:  Sustained.

1     Relevance?

2          MR. CASSON:  I'll withdraw it, your Honor.

3          MR. HALLSTEN:  What was that?

4          MR. CASSON:  I said I'll withdraw it.

5          MR. HALLSTEN:  Okay.

6     BY MR. CASSON:

7     Q.   When you became deputy director, who was the director of

8     the department?

9     A.   The director of Day Reporting?

10    Q.   Yes.

11    A.   When I became deputy director it was John Sullivan.

12    Q.   Approximately what year did Mr. Sullivan come in?

13    A.   I believe that was also 2002.

14    Q.   Did you ever have any altercations, or any arguments,

15    with Mr. Sullivan?

16    A.   Yes, I did.

17    Q.   And approximately what year did -- strike that.

18         Over what period of time did you have these

19    altercations with him?

20    A.   It was basically from about 2003 all the way

21    through 2006.

22    Q.   And in 2006 Mr. Sullivan took leave from the department?

23    A.   Yes.

24    Q.   Prior to that what were the problems that you were

25    having with Mr. Sullivan?

1    A.    Mr. Sullivan was very demeaning.  He would -- he
2    constantly used the B word --
3    Q.    What's the B word?
4    A.    He -- the bitch -- he would call me a bitch.
5    Q.    He called you?
6    A.    Yes.
7    Q.    On how many occasions?
8    A.    Numerous occasions.
9    Q.    Was it over a period of time or it just happened in a
10   short period of time?
11   A.    No.  It was over a progressive period of time.
12   Q.    Did he refer to you in any other manner?
13   A.    Well, he would call me stupid.  He would tell me to shut
14   the F up, you B, he would call me a stupid B, he would tell
15   me to go sit down and shut up, very degrading and
16   demoralizing.
17   Q.    Were there any other women who worked in the unit?
18   A.    Yes, there were.
19   Q.    And how many?
20   A.    There were, I believe, six.
21   Q.    And did you hear him refer to any of them --
22         MR. HALLSTEN:  Objection, your Honor.
23         THE COURT:  Yes.  What's the relevance of that?
24         MR. CASSON:  My question was, were there any other
25   references --

1      THE COURT:  I heard your question.  What's the

2   relevance?

3      MR. CASSON:  It goes directly to the Monell claim,

4   your Honor.

5      THE COURT:  Let me see you at sidebar.

6      (Sidebar proceedings outside the hearing of the jury:)

7      THE COURT:  This goes to pattern and practice?

8      MR. CASSON:  It does.

9      THE COURT:  What do you say to that, Don?

10      MR. HALLSTEN:  Mr. Sullivan's treatment towards her

11   and defendant's action or inaction -- Ms. Passananti is now

12   presenting evidence of how he treated other people.  It's

13   going to be hearsay and it's going to be just improper

14   character evidence of this man.

15      THE COURT:  She's testifying that she heard this of

16   her own perception, so it's not hearsay.

17      MR. HALLSTEN:  Okay.  Well's it's improper

18   character evidence.  She needs to prove this case of how he

19   treated her, not how he treated other --

20      MR. CASSON:  Under 608, Judge --

21      THE COURT:  Wait a minute.  Hold it a second.

22   Character evidence really is generally under Article IV.  608

23   talks about attacking a witness because of some prior act of

24   dishonesty, if you're talking about 608(b).

25      What does this go to?

1          MR. CASSON:  It goes to the pattern and practice,

2    your Honor.  It is -- it's not improper character evidence --

3          THE COURT:  Forget that for a minute.  Just tell me

4    what you're offering this for.

5          MR. CASSON:  I'm offering it to show there was a

6    pattern of abuse of other women.

7          THE COURT:  By the department or by Sullivan?

8          MR. CASSON:  By Sullivan, therefore the department.

9    And I'm -- these incidents happened.

10          THE COURT:  Was Sullivan a decision-maker?

11          MR. CASSON:  He was director of the department.  We

12    say, yes, he was.

13          MR. HALLSTEN:  Plaintiff is not alleging intangible

14    employment action in this case, so there's not an issue of

15    whether or not --

16          THE COURT:  That's true.  Your theory is wrongful

17    termination.

18          MR. CASSON:  Yes.

19          THE COURT:  Not discrimination while she was

20    employed but wrongful termination, right?

21          MR. CASSON:  No.  We're showing that there was --

22    that she, in fact, was discriminated while employed.

23          THE COURT:  Yes, but your theory is wrongful

24    termination.

25          MR. CASSON:  She was ultimately terminated.  Yes,

1   there's a termination in this case.

2           THE COURT:  What did I rule on last week?

3           MR. CASSON:  Promotion.

4           THE COURT:  Okay, promotion is out.  If you're

5   talking about a hostile work environment -- is that your

6   theory now?

7           MR. CASSON:  Yes.

8           THE COURT:  Well, you didn't plead a hostile work

9   environment.

10          MR. CASSON:  We did.

11          THE COURT:  You did?

12          MR. CASSON:  There's a jury instruction on this --

13          THE COURT:  Hold on.

14      (Brief pause.)

15          THE COURT:  Count 2 is hostile work environment.

16          MR. HALLSTEN:  That's correct, your Honor.

17          THE COURT:  Why does this not go to that?

18          MR. BOWMAN:  Because he has to demonstrate that

19  Sullivan created a hostile work environment for her, that

20  Sullivan spoke to other people --

21          THE COURT:  He's testified to that.  But doesn't

22  this also testify to the general work environment of other

23  people similarly situated?

24          MR. HALLSTEN:  But similarly situated doesn't --

25  that doesn't establish a hostile work environment.  That's

1    something different altogether.  He has to establish that the

2    environment was hostile to her based on what he did to her.

3              THE COURT:  Right.

4              MR. CASSON:  No, that's not what the law says,

5    though, Judge.  It's -- the totality of the --

6              THE COURT:  Forget that stuff.  Tell me why this is

7    relevant to her hostile work environment, what he said to

8    other people.

9              MR. CASSON:  It's what created part of --

10             THE COURT:  It's what is directed to her -- he

11   could have done this to her and it still would be a hostile

12   work environment.

13             MR. CASSON:  That's correct.

14             THE COURT:  I'm going to sustain the objection.

15        (Further proceedings within the hearing of the jury:)

16             THE COURT:  You may proceed.

17             MR. CASSON:  Thank you, your Honor.

18   BY MR. CASSON:

19   Q.   In a particular instance in 2005, did you have an

20   altercation with Mr. Sullivan?

21   A.   Yes, I did.

22   Q.   Describe for the jury what that altercation was and

23   where it was?

24   A.   The altercation took place in his office at Day

25   Reporting.

1  Q.   How did you come to be in his office?

2  A.   He called me in there and he told me that he was going

3  to open up an investigation on what he stated was a

4  violation.  And we -- he -- I told him that there was no

5  violation, and he -- he wouldn't listen to me and he started

6  screaming at me, and he told me to shut the F up, you lying

7  B, and he told me that he was going to -- that -- don't think

8  for one minute that he doesn't know that I was sleeping with

9  an inmate and he was going to --

10  Q.   I meaning you, Kim Passananti?

11  A.   I, me, yes, that I was sleeping with an inmate, and that

12  he was going to effectively get me suspended and -- well, we

13  would just see where the chips would fall.

14  Q.   As a result of that incident -- strike that.

15       Did you hear him use any foul language any other

16  time?

17  A.   Yes.

18  Q.   And what language was that?

19  A.   Most of the time it would be if somebody was in the

20  office -- in my office or one of the women that would come

21  in, he -- he consistently referred -- he would say, you know,

22  what the F --

23       MR. HALLSTEN:  Objection, your Honor.

24       THE COURT:  Sustained.  I think we went over that

25  once before, Mr. Casson.

1      Ladies and gentlemen, I'll instruct you to
2  disregard that.
3  BY MR. CASSON:
4  Q.   What I'm asking you is in relation to you.
5  A.   In relation to me?
6  Q.   Yes.
7  A.   Yes.  Any other times, is that what I understand?
8  Q.   Yes.
9  A.   Yes.  He would tell -- there were several times that he
10  would say, you know, you just need to shut the F up, you're a
11  little B, don't make me, you know, get you suspended again,
12  you didn't learn your lesson the last time.  It was just very
13  -- a very abusive --
14  Q.   As a result of the incident in 2005 -- by the way, what
15  month was that in?
16  A.   It happened in August of 2005.
17  Q.   Okay.  And in -- as a result, did Mr. Sullivan take any
18  action against you?
19  A.   Yes.
20  Q.   What happened?
21  A.   He wrote a document and he forwarded it to the Inspector
22  General's Office, and the Inspector General's office opened
23  up an investigation on the alleged incident.
24  Q.   And that was an action against you, correct?
25  A.   Yes, it was an action against me.

1   Q.   Did you try to explain what had happened to Mr. -- I'm
2   sorry, can you see me?
3   A.   Yes.
4   Q.   Did you try to explain what happened to Mr. Sullivan?
5   A.   Yes.  I tried to explain to him that the information
6   that he got was completely and totally false.  And I told him
7   that -- how do you start an investigation on somebody that
8   didn't violate a rule that was -- that was even implemented.
9   Q.   So he was claiming that a rule was broken?
10  A.   Yes, he was claiming that a rule was broken.
11  Q.   And was there a rule?
12  A.   No, there was not a rule.
13  Q.   Was there a general order?
14  A.   No, there was not a general order.
15  Q.   Was there a regulation?
16  A.   There was no regulation.
17  Q.   Was there a written order?
18  A.   There was no written order, no.
19  Q.   Did Mr. Sullivan express an understanding of what the
20  rules and regulations and procedures of the department were,
21  of the DRC?
22  A.   A vague understanding of what the program was about.
23  Q.   Who was responsible for really the operations of the
24  unit on a day-to-day basis?
25  A.   I was.  I was responsible for the day-to-day operation

1    of the program.

2    Q.   Well, as a result of what had happened you said you were

3    transferred?

4    A.   Yes.  I was transferred to another department, to SWAP,

5    the Sheriff's Work Alternative Program at the juvenile

6    building.

7    Q.   And what was your job there?

8    A.   I was a secretary.

9    Q.   You went from deputy director --

10   A.   -- to secretary, yes.

11   Q.   Did you have supervisory responsibilities as deputy

12   director?

13   A.   Yes, I did.

14            THE COURT:  What does the acronym SWAP -- what does

15   that stand for?

16            THE WITNESS:  The Sheriff's Work Alternative

17   Program.

18            THE COURT:  Thank you.

19            THE WITNESS:  You're welcome, your Honor.

20   BY MR. CASSON:

21   Q.   During the time that you were assigned to SWAP, did you

22   speak to anybody about what had happened?

23   A.   Yes.

24   Q.   Did you speak to anybody about the comments that

25   Mr. Sullivan had made both then and prior to that?

1  A.    Yes.

2  Q.    And who did you speak to?

3  A.    I spoke to Dan Gallagher, I spoke to Carmelita Wagner.

4  Q.    With regard to Mr. Gallagher, who is Dan Gallagher?

5  A.    Dan Gallagher at the time was Sheriff Sheehan's special

6  counsel.

7  Q.    Why did you go to him?

8  A.    I went to him because he was not in the department and I

9  believed that he would get the information to the Sheriff so

10  the Sheriff knew what was going on in my department with me.

11  Q.    What does Mr. Gallagher do for a living?

12  A.    He's an attorney.

13  Q.    Does he work for the Sheriff's Department?

14  A.    No, he does not.

15  Q.    Does he work for the Sheriff?

16  A.    No, he does not.

17  Q.    Who else did you speak to?

18  A.    I spoke to Carmelita Wagner.

19  Q.    Where did you speak to Ms. Wagner?

20  A.    I called her at her office in -- at the training

21  academy.

22  Q.    Why did you speak to Carmelita Wagner?

23  A.    I spoke to Carmelita because I knew her and I felt that

24  she would be an advocate for me in this situation.

25  Q.    What did you tell Carmelita?

1   A.   I told her everything that was going on.  I told her

2   what was happening with the situation, that -- the present

3   situation.  I told her what I was enduring previous to that

4   situation and what they intended to do with me, and she told

5   me, sometimes, Kim, you just have to take one for the

6   Sheriff.

7   Q.   And what did that mean?

8   A.   That means that you should just -- as far as I was

9   concerned, she told me to just shut up and take it.

10  Q.   Carmelita Wagner was occupying what position when she

11  told you that?

12  A.   She was the executive director of the Sheriff's training

13  academy.

14  Q.   Did she outrank you?

15  A.   Yes, she did.

16  Q.   Was she at a higher level on the chain of command?

17  A.   Yes, she was.

18  Q.   Did you perceive what you were doing to be a complaint?

19  A.   Yes.

20            THE COURT:  Let me interrupt you there for a

21  moment.

22        (Sidebar proceedings outside the hearing of the jury:)

23            THE COURT:  I'm going to reverse myself.  In the

24  Monell claim you do plead that the defendants have engaged in

25  the policy, practice of sexual harassment, discrimination

1    against women.  So this would go to that claim.  So I'm going

2    to reverse myself.

3              The objection is overruled.  You can go into that.

4              MR. CASSON:  Thank you.

5              THE COURT:  You're welcome.

6         (Further proceedings in the presence of the jury:)

7              THE COURT:  You may proceed.

8              MR. CASSON:  Thank you, your Honor.

9    BY MR. CASSON:

10   Q.   The letter that you sent to Mr. Gallagher -- strike

11   that.  Sorry, your Honor.

12             How did you communicate with Mr. Gallagher?

13   A.   I sent him a -- I believe it was about a seven-page

14   letter outlining what was going on at the Sheriff's

15   Department.

16   Q.   And when you say going on, what do you mean?  What did

17   you write about?

18   A.   I wrote about how I was being treated and about the

19   situation that was going on with the inmate by the name of

20   Thomas Bewack (phonetic) and everything that I was feeling at

21   the time.

22   Q.   Okay.  I'm asking you specifically what did you lay out

23   in this letter about Mr. Sullivan?

24   A.   I laid out how he was behaving and how he was treating

25   me and that he used foul language with me.  I quoted in the

1   letter what he had said to me, and in the -- just -- that was

2   my plea for help.

3   Q.   Did you indicate to Mr. Gallagher in your letter that he

4   had called you -- or referred to you as a bitch?

5   A.   Yes.

6   Q.   Now, when you spoke to Ms. Wagner -- strike that.

7            When --

8            MR. CASSON:  Judge, I keep saying "strike that"

9   because it's just habit.

10           THE COURT:  You want to withdraw that.

11  BY MR. CASSON:

12  Q.   The letter to Mr. Gallagher, explain to me why you would

13  send a letter to an outside lawyer?

14  A.   Because I knew that if it stayed internally, that it

15  would never have gotten anywhere, that I -- there would have

16  been -- there's no confidentiality.  I felt that Mr.

17  Gallagher would take my best interests to heart and open up

18  an investigation or get it to the Sheriff so the Sheriff

19  would open up an investigation as to what was going on in the

20  department.

21  Q.   Now, you're familiar with the general orders, are you

22  not?

23  A.   Yes, I am.

24  Q.   Explain to the jury why it is that you would be familiar

25  with general orders?

```
 1   A.   I taught sexual harassment to all of the recruits and
 2   all of the in-service classes that went on at the Sheriff's
 3   Department, and I taught sexual harassment, the policy and --
 4   the legal aspect of the policy and domestic violence.
 5   Q.   And in the course of your teaching, did you have a
 6   curriculum that was approved by the department?
 7   A.   Yes.
 8   Q.   How many ways are there to complain under the policy?
 9   A.   There's a multitude of ways to complain.
10   Q.   For instance?
11   A.   Verbal, written.  Those are the main -- the main ways to
12   complain about sexual harassment.
13   Q.   There's a form --
14   A.   As far as the general order goes, yes.
15   Q.   The general order has a form?
16   A.   Yes, the general order has a form.
17   Q.   Is that the only way you can complain, is by filling out
18   that form?
19   A.   No, that is not the only way you can complain.
20   Q.   While you were deputy director, did you become aware of
21   harassment or discrimination complaints made within the
22   department as a function of your job?
23   A.   Yes, I did.
24   Q.   Tell the jury what your function was in the process of
25   those complaints?
```

1   A.   I would -- if I came to know about any type of

2   harassment, I encouraged the investigators or the victim of

3   the domestic -- or sexual harassment to tell somebody, to go

4   and file a formal complaint.

5   Q.   Okay.  And do you recall a discussion with Mr. Sullivan

6   about complaints of this type?

7   A.   Yes.

8   Q.   And did they involve a --

9             THE COURT:  When did that occur?  When did that

10  discussion occur?

11            THE WITNESS:  The discussion occurred -- it

12  occurred on two different occasions, your Honor.

13            THE COURT:  What was the first occasion?

14            THE WITNESS:  One occasion would probably have been

15  right around 2006.

16            THE COURT:  Where did that occur?

17            THE WITNESS:  Both of them were in 2006.

18            THE COURT:  Where did the first one occur?

19            THE WITNESS:  The first one occurred in Mr.

20  Sullivan's office at Day Reporting -- both of them occurred

21  in Mr. Sullivan's office.

22            THE COURT:  Who was present?

23            THE WITNESS:  It was him and I.

24            THE COURT:  Okay.

25  BY MR. CASSON:

Passahant - Direct                    43

1    Q.   And who was the investigator involved?

2    A.   The first investigator involved was Tenille Miller, and

3    the second was Sally Guide-Campillo.

4    Q.   With regard to Ms. Miller, what did Mr. Sullivan say?

5    A.   He told -- he told me --

6              MR. HALLSTEN:  Objection, your Honor, foundation.

7              THE COURT:  Can you give us a little more

8    specificity as to the time in 2006 the first conversation

9    regarding Ms. Miller -- when that took place?

10             THE WITNESS:  As far as the -- a timeframe, your

11   Honor?

12             THE COURT:  Yes.

13             THE WITNESS:  I'm going to say early in 2006.

14             THE COURT:  Okay.

15   BY MR. CASSON:

16   Q.   Was it still in the wintertime?

17   A.   I believe so.

18   Q.   And --

19   A.   I believe so.

20   Q.   And the second --

21             THE COURT:  Why don't we just take the first one

22   now and --

23             MR. CASSON:  Yes, your Honor.

24   BY MR. CASSON:

25   Q.   The first one regarded Ms. Miller, correct?

1  A.   That's correct.

2  Q.   What did Mr. Sullivan say?

3  A.   He said that we can't have this type of thing going on

4  at Day Reporting, that it was just going to have to --

5            MR. HALLSTEN:  Objection, your Honor.  We don't

6  have any idea what the witness is talking about, what's been

7  going on.  There's no foundation for this conversation.

8            THE COURT:  Why don't you lay a little better

9  foundation, Mr. Casson.

10            MR. CASSON:  Sure.

11  BY MR. CASSON:

12  Q.   At the time that you had the conversation -- first, did

13  he call you into his office at that point?

14  A.   Yes, he did.

15  Q.   Did you know why?

16  A.   No, I did not.

17  Q.   Where was his office in relation --

18            THE COURT:  I think that's good enough.  Can we get

19  to the nature of the conversation?

20            MR. CASSON:  Sure.

21  BY MR. CASSON:

22  Q.   What was the nature of the conversation?

23  A.   The nature of the conversation was the sexual harassment

24  allegation by Tenille Miller.

25  Q.   And how did you become aware of it?

1    A.   I became aware of it from Director Sullivan.

2    Q.   And this was in the same conversation?

3    A.   Yes, it was.

4    Q.   What did he say?

5    A.   He said that we can't have these allegations going on at

6    Day Reporting, that -- he just wanted this to go away.

7    Q.   Were you given any instructions on how to make it go

8    away?

9    A.   No, I was not.

10   Q.   What happened to the complaint?

11   A.   It was unfounded.

12   Q.   It was -- did you make that finding?

13   A.   No, I did not make that finding.

14   Q.   How many -- are you aware of any investigations that --

15   strike that.

16        What does unfounded mean?

17   A.   Unfounded means that they -- that it was -- there was no

18   -- no credence to the complaint whatsoever.

19   Q.   Was there an investigation?

20   A.   Yes.

21   Q.   And what was the investigation consisted of -- what did

22   it consist of?

23   A.   It was --

24        MR. HALLSTEN:  Objection, your Honor, foundation.

25        THE COURT:  Yes.  She can testify to her own

1    firsthand knowledge.  If she's testifying to some hearsay

2    information, you're going have to identify it.

3    BY MR. CASSON:

4    Q.   The second incident, who did that involve?

5    A.   It involved Sally Guide-Campillo.

6    Q.   And when did you have that conversation with

7    Mr. Sullivan?

8    A.   It was after Investigator Campillo had already written

9    the paperwork and sent it to Internal Affairs.

10   Q.   Is that an effective way to complain --

11   A.   No.

12   Q.   -- under the policy?

13   A.   No.

14   Q.   Why?

15   A.   It's totally ineffective because that doesn't -- the

16   policy doesn't mirror the practice in the Sheriff's

17   Department.

18   Q.   And how is that?

19   A.   The policy says that this is what's going to happen:

20   You are going to write a complaint, it's going to -- an

21   investigation is going to be opened, we are going to do an

22   investigation, we are going to question people, we are going

23   to be fair and open-minded, and we are going to look at all

24   the facts and we are going to make a determination.  That's

25   what the policy says.

1    The practice says if you put it in writing and you
2    make a complaint, you are going to be demoted, you are going
3    to be punished, you are going to be -- you're going to be in
4    a lot of trouble.
5    Q.   And was that your understanding of what Mr. Sullivan was
6    telling you with regard to Ms. Miller?
7    A.   Yes, absolutely.
8    Q.   Were you ever asked by Mr. Sullivan to have a
9    conversation with Ms. Campillo?
10   A.   Yes.
11   Q.   And what were you asked to say?
12   A.   I was asked to tell her to quit putting things on F'g
13   paper.
14   Q.   And what did the paper refer to?
15   A.   The paper referred to the complaints that she was making
16   about the abusive situations at Day Reporting.
17   Q.   Was Ms. Campillo ever promoted, to your knowledge?
18   A.   No, she was not.
19   Q.   Was Ms. Miller ever promoted?
20   A.   No, she was not.
21   Q.   Were you aware of any other employees who made
22   complaints?
23   A.   Yes.
24   Q.   And who were they?
25   A.   Investigator Jeanie Foster made a complaint,

1   Investigator Sarah Tucker made a complaint, Investigator

2   Tenille Miller and Investigator Thelma Meredith made a

3   complaint.

4   Q.   Did Mr. Sullivan ever indicate to you that he was going

5   to have you fired?

6   A.   Yes.

7   Q.   When did he say that to you?

8   A.   He said that to me in 2005 and he said it again in 2006.

9   Q.   And where were you when he said that?

10  A.   We were -- I was in his office both times.

11  Q.   And what was -- what were you doing in his office?

12  A.   He had called me in there.  The 2005 incident was when

13  he had told me that he was going to open up the

14  investigation, and the 2006 incident was when Investigator

15  Campillo, when he told me to get her to quit putting things

16  on F'g paper, and obviously I didn't learn my lesson the

17  first time, that he was going to have to take it a step

18  further.

19  Q.   Okay.  In that incident in 2005, ultimately what were

20  you charged with?

21  A.   I was charged with letting a participant go that had

22  tampered with urine and allowing an investigator to

23  circumvent the chain of command by speaking with them.

24  Q.   Was any of that true?

25  A.   No, it was not.

1    Q.   Was there a rule on tampering with urine?

2    A.   No, there was not.

3    Q.   And did you have anybody circumvent any chain of

4    authority?

5    A.   Absolutely not.

6    Q.   Was there a particular general order that you were

7    accused of violating?

8    A.   They used rules of conduct, which is really a catch-all

9    general order.  You can -- from stepping on a crack in the

10   sidewalk to going all the way up to a major transgression.

11   Q.   Based on your experience within the department, when

12   there is truly a need for disciplinary action, is it related

13   in any way to the general orders?

14   A.   Not really.

15   Q.   While you were at the -- under the direction of

16   Mr. Sullivan, what was the process, or protocols of

17   discipline that he employed?

18   A.   He would tell somebody -- if he didn't like somebody, he

19   would put his two chiefs who were his -- pretty much his

20   minions, he would put them on them and he would get them to

21   start writing them up and building a case against them.

22   Q.   Was there any avenue to defend one's self?

23   A.   No.

24   Q.   Why?

25   A.   It was a totally ineffective entire false wall of

1    defense.  It was -- if --

2    Q.   I'm not sure I know what you mean there.

3            Could you defend yourself if you were accused by

4    Mr. Sullivan?

5    A.   You could.

6    Q.   To what end?

7    A.   To no end.

8    Q.   When was the determination made?

9    A.   The determination was made when he told them what

10   determination should be made.

11   Q.   Did he make the disciplinary determination?

12   A.   No.  He told whoever was in charge of making the

13   disciplinary determination, whether it was the Inspector

14   General's office or the Internal Affairs office.

15   Q.   So he would tell them what he wanted?

16   A.   Yes.

17   Q.   Did Mr. Sullivan do anything else that affected how you

18   did your job after the incident in 2005?

19   A.   Yes.  Mr. Sullivan had me pretty much ostracized.  He

20   told me I had to write a memo, that no investigators could

21   come in and talk to me.  He told me that I had to go to the

22   investigators' chiefs and ask the investigators' chiefs if I

23   could talk to them.  And I had to give the investigators'

24   chiefs a little background on what I wanted to talk to them

25   about.  And I wasn't allowed to talk to anybody.  I was -- he

1    wanted me to sit in my office and just stay in my office.

2    Q.   Did you have any discussions with him about that

3    decision?

4    A.   It was futile to have any discussions about that

5    decision.

6    Q.   Did you have any other -- were you able to do your job

7    at that point?

8    A.   No.

9    Q.   Why?

10   A.   It's hard to do your job with your hands tied behind

11   your back.

12   Q.   Was this important to you, to be able to do that?

13   A.   It was very important to me.

14   Q.   Why?

15   A.   I loved my job.  I really did love my job.  It was -- I

16   got such a sense of satisfaction from it.  It really -- it

17   was -- it meant a lot to me.

18   Q.   When you left the department how much were you earning?

19   A.   Approximately $83,000 a year.

20   Q.   And how long did it take you to get to that point?

21   A.   13-and-a-half years.

22   Q.   Did you have any benefits?

23   A.   Did I?  Yes, I had benefits.  I had medical, dental,

24   vision.

25   Q.   When you were let go did you have any other means of

1    income?

2    A.    None.

3    Q.    Did you earn any income from the college?

4    A.    Approximately $3500 a semester.

5    Q.    That's -- is that the same amount that you had been

6    earning while you were employed?

7    A.    Yes.

8    Q.    And did you have any other jobs in 2007?

9    A.    In 2007?  No.

10   Q.    How about in 2008?

11   A.    In 2008, yes.

12   Q.    What did you do?

13   A.    I found a job at the Oak Lawn Elks Club.

14   Q.    I take it the Oak Lawn Elks Club is in Oak Lawn?

15   A.    Yes, it is in Oak Lawn.

16   Q.    Who turned out to be a member after -- did you find out

17   that a particular somebody turned out to be a member of the

18   Elks Club?

19   A.    Yes.

20   Q.    And who was that?

21   A.    Mr. Sullivan.

22   Q.    How long did you have that job?

23   A.    I had the job for less than a year.

24   Q.    Okay.  And after you left, did you get any other

25   employment?

1    A.    While I was still employed at the Oak Lawn Elks Club, I

2    got a job at Christ Hospital and Medical Center.

3    Q.    And where are you employed now?

4    A.    At Christ Hospital and Medical Center.

5    Q.    What is your job?  What do you do?

6    A.    I'm a secretary in the emergency room.

7    Q.    How much do you earn there?

8    A.    Approximately -- well, $15.75 an hour because I -- I

9    work 3:00 to 11:00, so I get an afternoon differential.

10   Q.    How much a year?

11   A.    I believe it's maybe $30,000 a year.

12   Q.    And you still get the -- you still earn $3500 a semester

13   at the college?

14   A.    Yes, yes, I still teach at the college.

15   Q.    Have you gone to see any -- have you had any physical

16   problems as a result of what happened at work -- at the

17   Sheriff's Department?

18   A.    Yes.

19   Q.    What are they?

20   A.    Since 2005 I've experienced bouts of depression and

21   anxiety, and I have pretty good bouts with insomnia and

22   stomach problems.

23   Q.    Did you go see a doctor about it?

24   A.    Yes.

25   Q.    Who did you go see?

1    A.    I see Dr. Nancy Nelson for -- she's a psychotherapist

2    for the depression and the anxiety.

3    Q.    And how long have you been seeing her?

4    A.    Since 2005.

5    Q.    When in 2005 did you begin seeing her?

6    A.    Right after I was detailed to SWAP, after the incident

7    occurred at the Day Reporting program.

8    Q.    On the day of the one particular incident, were you

9    upset that day?

10   A.    Oh, yes, I was hysterical.

11   Q.    What do you mean hysterical?  What did you do?

12   A.    I was crying and I was -- I was yelling.  I just -- I --

13   I couldn't believe that he didn't understand what was going

14   on and that he was talking to me in the manner that he was

15   talking to me.

16   Q.    Did anybody else -- was anybody else in the room when

17   you were crying?

18   A.    Investigator Acevedo I believe came into my office right

19   after the incident happened.  I was still -- I was in my

20   office at the time and I was still crying.

21   Q.    Did anybody else come into your office or come by your

22   office?

23   A.    Investigator Roberts was standing outside of the main

24   office where our offices were located.  Investigator Campillo

25   was in the mail room, which was a room right outside of our

```
 1    offices.  And Investigator Gauntley (phonetic) was standing
 2    in the hallway right outside of our office.
 3    Q.   Were you able to drive home that day?
 4    A.   No.
 5    Q.   Who came and got you?
 6    A.   My husband came and got me.
 7    Q.   Were you still crying when he got there?
 8    A.   Yes.
 9    Q.   Explain why that -- why it was so upsetting that you
10    were crying that long?
11    A.   Because I -- it was horrifying.  It was a horrifying
12    situation, just to know that somebody had that much -- had
13    that much power over you that no matter what you said, no
14    matter what the truth was, that it didn't matter.  Nothing
15    mattered at that point except for where it was going and how
16    he was screaming at me.
17    Q.   Had you ever been accused of having a sexual
18    relationship with a prisoner or an inmate?
19    A.   Never, not up until that day.
20    Q.   Did you end up having to tell your husband and family
21    about it?
22    A.   Yes.
23    Q.   What did you tell them?
24    A.   I told them that -- what he had accused me of and that,
25    you know, I -- I would never want to ever cause any disgrace
```

1   on my family like that.

2   Q.   Is it a violation of the general orders?

3            THE COURT:   I think we've covered this, Mr. Casson.

4            MR. CASSON:   Okay, Judge.   I'll move on.

5   BY MR. CASSON:

6   Q.   When you sought treatment, did you tell the -- did you

7   explain this to your therapist?

8   A.   Yes.

9   Q.   And what was the course of treatment?

10  A.   I went to see her twice a week.   Then I couldn't afford

11  to go twice a week any more, so I had to go every other week,

12  and I continued with that until just recently.   I didn't have

13  insurance for a long time.

14  Q.   Have you started to see her less recently?

15  A.   Yes.

16  Q.   Did you see any medical doctors?

17  A.   Yes.

18  Q.   And why did you go see the medical doctors?

19  A.   For my insomnia and my stomach problems.

20  Q.   And who did you see?

21  A.   Dr. Theresa O'Connor.

22  Q.   And how long did you see Dr. O'Connor for your physical

23  problems?

24  A.   Twice a year I go to her.

25  Q.   Were you prescribed any medications?

Passanante - direct                                        57

1    A.    Yes.

2    Q.    What?

3    A.    I was prescribed Paxil.

4    Q.    Any others?

5    A.    I take Estradiol, which is a hormone.

6    Q.    What is it that you feel you lost when you lost your job

7    as deputy director?

8    A.    I lost a big part of my life.  That was -- it wasn't a

9    job -- that was not a job to me; that was my career.  I was

10   very invested in the program, in the success of the program,

11   in the success of the participants, in seeing somebody that

12   came into the program who virtually didn't have any tools

13   whatsoever and walk out of the program with a G.E.D. and

14   active employment and -- it just was a very satisfying

15   career.  I lost a lot.

16   Q.    And in comparison, what was it that Mr. Sullivan

17   expressed to you about the value of that program?

18   A.    Well, Mr. Sullivan was retired.  He was -- he came in

19   and he was a retired -- he was retired and he was collecting

20   a pension.  And he said on more than one occasion that the

21   money that he made at Day Reporting was the easiest 90,000 he

22   ever made in his life.

23   Q.    Was that one of the reasons why you had mostly

24   operational responsibility?

25   A.    Yes.  He didn't understand the program, he didn't

1    understand the concept of the program.  And he never really

2    expressed an interest in learning the meat and potatoes of

3    the program.

4    Q.   But you did?

5    A.   Yes.

6              MR. CASSON:  Judge, that's all I have.  Thank you.

7              THE COURT:  Cross?

8              MR. BOWMAN:  Judge, we're going to use the ELMO.

9              THE COURT:  Do you want the ELMO?

10             MR. BOWMAN:  Yes.

11             THE COURT:  All right.  Let's take a break now.

12   We're going to have to bring up Mark from the technical

13   department.

14             We'll take a recess, ladies and gentlemen, while we

15   work on this.

16             You can step down.  Let me ask you not to discuss

17   your testimony with anyone until you have completed your

18   examination.

19             (Brief recess was taken.)

20

21

22

23

24

25

Passananti - Cross                                                    59

```
 1              (Jury enters courtroom.)
 2                  THE COURT:  You may come up.
 3                  Ready to proceed?
 4                  MR. HALLSTEN:  Yes, your Honor.
 5                  THE COURT:  Very well.
 6      BY MR. HALLSTEN:
 7      Q.   Good afternoon, Miss Passananti.
 8      A.   Good afternoon.
 9      Q.   Now, you testified in 2008 you worked for the Elks Club?
10      A.   Correct.
11      Q.   And you had a year-long contract with the Elk Club --
12      Elks Club, didn't you?
13      A.   Yes.
14      Q.   But you testified you left shorter than a year, didn't
15      you?
16      A.   That's correct.
17      Q.   And why did you leave shorter than a year, Miss
18      Passananti?
19                  MR. CASSON:  Objection.  Relevance, your Honor.
20                  THE COURT:  Overruled.
21      BY THE WITNESS:
22      A.   I left because there was a -- it was a very closed
23      system at the Elks Club and I felt that I was un -- unwanted.
24      And that is not a nice place -- that is not a nice thing to
25      feel when you are working somewhere.
```

Passananti - Cross 60

1   Q.   You, in fact, negotiated a buy-out of your contract,
2   didn't you, Miss Passananti?
3   A.   Yes.  I offered them to buy me out of my contract, yes.
4   Q.   And what was it that you offered them in exchange for
5   that buy-out?
6   A.   Well, they -- if I would have stayed, they would have
7   had to pay me X amount of dollars.  And I took and chopped it
8   in half and -- and they bought me out of my contract for
9   $12,500.00.
10  Q.   Didn't you, in fact, tell them that if they bought you
11  out of your contract, that you wouldn't file a harassment
12  charge against them?
13  A.   No, I did not.
14  Q.   Miss Passananti, do you recall giving a deposition in
15  this case on February 18th, 2010?
16  A.   Yes.
17  Q.   And at that deposition your attorney, Mr. Casson, was
18  present and I and Mr. Bowman were -- were present and you --
19  you gave questions and answers and a court reporter was
20  present, correct?
21  A.   Correct.
22  Q.   And you -- you recall me asking you questions and you
23  giving answers, correct?
24  A.   That's correct.
25  Q.   Do you recall me asking this question of you at that

Passananti - Cross

1    deposition and you giving the following answer:

2                MR. CASSON:  Page and line number, counsel.

3                MR. HALLSTEN:  Page 109, 20 -- starting at 23.

4    BY MR. HALLSTEN:

5    Q.   "Q.  Well, did you state that you would accept the

6         buy-out in lieu of filing some type of charge against

7         them?

8         A.  Yes, yes.

9         Q.  And what was the basis of that potential charge

10        going to be?"

11               Mr. Casson objected on form and foundation, said,

12   "Go ahead and answer."  The witness testified:  "Hostile work

13   environment."

14   A.   It was a very hostile environment there.

15               THE COURT:  Did you answer that?  Did you make that

16   answer to that question, ma'am?

17               THE WITNESS:  Yes.

18   BY MR. HALLSTEN:

19   Q.   So a couple moments ago when I asked you if you offered

20   that buy-out in lieu of not filing a charge against them, you

21   said no.  And now it appears that you, in fact, did offer

22   them a buy-out so that you wouldn't file a hostile work

23   environment charge against them, correct?

24   A.   Well, there was no basis for a hostile work environment.

25               THE COURT:  Can you answer the question yes or no,

1    ma'am.

2              THE WITNESS:   No.

3              THE COURT:   Wait.   Could I hear -- would you read

4    the question back, please.

5         (Record read as requested.)

6              THE WITNESS:   Correct.

7    BY MR. HALLSTEN:

8    Q.   Now, let's go back to your employment with the Sheriff,

9    Miss Passananti.   You testified that you -- you taught sexual

10   harassment at the Training Academy, is that correct?

11   A.   That's correct.

12   Q.   And when these new cadets -- were these cadets that you

13   taught the training to?

14   A.   Yes.

15   Q.   And what was the type of training -- did you have a

16   classroom?   Did you lecture?   Is that how you taught sexual

17   harassment?

18   A.   Yes.

19   Q.   And did you have the General Order as one of the

20   documents that you taught from to these cadets?

21   A.   Yes.

22   Q.   And in your training seminars with these cadets, did you

23   ever tell your cadets that don't bother listening to me

24   because this policy is not enforced?

25   A.   No.

1    Q.   Okay.  Did you tell the cadets that this is important

2    policy that the Sheriff has initiated to protect you and your

3    rights in the workplace?

4    A.   Yes.

5    Q.   And, in fact, you are an expert on the sexual harassment

6    policy in the Sheriff's Office, correct?

7    A.   No.

8    Q.   You are not an expert.  Is there -- was there a time in

9    2003 or 2002 where you were asked by the Sheriff to testify

10   at a deposition as the Office's expert on sexual harassment

11   policies in the Jail?

12   A.   It wasn't as an expert.  It was as an officer of policy

13   for the Sheriff's Department, correct.

14   Q.   And you were to speak on behalf of the Sheriff's Office

15   regarding the sexual harassment policy, correct?

16   A.   That is correct.

17   Q.   And at that deposition did you -- did you state under

18   oath that you -- that there was nobody who knew more about

19   that policy in the Sheriff's Office than you?

20   A.   I don't recall saying that.

21   Q.   Do you recall giving a deposition on April 26th, 2002,

22   in that -- in that case where Dana Kurtz was present and your

23   -- you had a lawyer named Manny Flores --

24   A.   Yes.

25   Q.   -- and she asked you questions --

1   A.   Yes.

2   Q.   -- regarding this -- this matter?

3          And do you recall being asked this question, Miss

4   Passananti:  "With respect to number one, the policy,

5   practices and procedures regarding and related to sexual

6   harassment, gender discrimination and retaliation, do you

7   know of anyone else that is more knowledgeable than you --

8   than you that could testify about these topics?"  And you

9   answered, "No."

10          MR. CASSON:  Your Honor, I am going to object.  It

11   is not impeaching.

12          THE COURT:  It is an admission by a party opponent

13   under 801.

14          MR. CASSON:  I agree, but I think it is --

15          THE COURT:  Well, it is admissible.

16          MR. CASSON:  It is being offered as impeachment.

17          THE COURT:  It doesn't matter.  It is an admission

18   by a party opponent.

19          MR. CASSON:  I understand that, your Honor.

20   BY MR. HALLSTEN:

21   Q.   So on that date --

22          THE COURT:  Wait.  I don't know if she made an

23   answer to that question.

24          Can you find the question.  It is the one before

25   this last exchange.

1              (Record read as requested.)

2              THE COURT:  Was that question asked of you and did

3    you make that answer?

4              THE WITNESS:  Yes.

5    BY MR. HALLSTEN:

6    Q.   So it appears there was a time when you held out to

7    others on behalf of the Sheriff that you knew more about the

8    sexual harassment policy than anybody else in the Sheriff's

9    Office, isn't that correct?

10   A.   That's correct.

11   Q.   And that sexual harassment policy is contained in

12   General Order 3.7A, correct?

13   A.   Correct.

14   Q.   And general -- General Order 3.7A contains the entire

15   policy and includes a complaint form, correct?

16   A.   Correct.

17             THE COURT:  Mr. Hallsten -- we are off the record.

18        (Discussion held off the record.)

19   BY MR. HALLSTEN:

20   Q.   Miss Passananti, can you see the document on the screen

21   in front of you?

22   A.   Yes.

23             THE COURT:  Do you want to give that an exhibit

24   designation, please.

25             MR. HALLSTEN:  I don't know that we have numbers.

1   It is the General Order 3.78.

2           THE COURT:  Exhibit General Order.  What is the

3   No. 3 point?

4           MR. HALLSTEN:  7A.

5           THE COURT:  7A, as in apple?

6           MR. HALLSTEN:  Yes, your Honor.

7           THE COURT:  Okay.  Is there an objection to -- to

8   the admission of this, Mr. Casson?

9           MR. CASSON:  No, your Honor.

10          THE COURT:  All right.  That will be admitted.

11      (Above-named exhibit received in evidence.)

12          THE COURT:  Do you want to publish that?

13          MR. HALLSTEN:  Yes, your Honor.

14  BY MR. HALLSTEN:

15  Q.   Miss Passananti, do you recognize the first page of this

16  exhibit?

17  A.   Yes.

18  Q.   And is this page that I am show -- that you see on your,

19  screen is this an accurate copy of the first page of the

20  General Order 3.7A?

21  A.   Yes.

22  Q.   And is this, in fact, the sexual harassment policy that

23  the Sheriff has in place at the Jail?

24  A.   Yes.

25  Q.   And is this the policy from -- is this the General Order

1    from which you teach your cadets at Training Academy the

2    sexual harassment policies at the Jail?

3    A.    That's correct.

4    Q.    And when you -- I am going to --

5              THE COURT:  You can zoom in on that too.

6              MR. HALLSTEN:  Thank you, your Honor.

7              THE COURT:  Do you see the controls?  There is

8    controls on that little ledge that comes out.  And I think

9    there is controls on the Elmo itself.

10             MR. HALLSTEN:  Thank you.

11   BY MR. HALLSTEN:

12   Q.    Now, contained in this General Order, Miss Passananti,

13   is a reporting mechanism, isn't it -- is that not correct?

14   A.    Yes, that's correct.

15   Q.    Okay.  And I am going to turn to Page 3 of the General

16   Order and show you -- do you recognize that portion of the

17   General Order which is highlighted -- is -- by letter B,

18   which just left the screen.

19             Hold on a second.  Jamie.

20             THE COURT:  Mr. Bowman, maybe you can operate it.

21             MR. HALLSTEN:  You moved it too much.

22             THE COURT:  We will see how many lawyers it takes

23   to operate --

24             MR. HALLSTEN:  All right.  That is good.

25             THE COURT:  You might zoom on that just a might

1    more.

2            I can do it from up here, if you want to hold on a

3    second.  Let me try my hand at it.

4            I take it back.

5            MR. HALLSTEN:  I am afraid to touch it again.

6            THE COURT:  I am not getting it.  Mr. Bowman, maybe

7    you can zoom in for us a little bit.

8            MR. HALLSTEN:  That is good.

9            THE COURT:  There you go.

10           Can you see that, ladies and gentlemen?

11   BY MR. HALLSTEN:

12   Q.   All right.  In this little break, Miss Passananti, have

13   you had a chance to review -- have you had a chance to review

14   those reporting provisions as we were playing with the Elmo?

15   A.   Yes.

16   Q.   Now, are these the reporting procedures that are

17   contained in the General Order as you understand it?

18   A.   Yes.

19   Q.   Okay.  And are these the same reporting procedures that

20   you teach to the cadets in the Training Academy?

21   A.   Yes.

22   Q.   And that you -- do you tell these cadets that if they

23   utilize these reporting procedures, that will be protected

24   from sexual harassment in the workplace?

25   A.   I tell them verbatim what the General Order states.

1    Q.    And you tell them this is what they should do if they

2    are subjected to unwarranted sexual harassment conduct in the

3    workplace, correct?

4    A.    That is correct.

5    Q.    Okay. And let's take -- let's take the first paragraph.

6    The first paragraph says, "The Sheriff's Office will attempt

7    to provide employees with convenient, confidential and

8    reliable mechanisms for reporting incidents of sexual

9    harassment and retaliation." This General Order implies that

10    there is more than one reporting mechanism. Is that your

11    understanding of this?

12    A.    Yes.

13    Q.    Okay. The second sentence allows an employee up to a

14    year to make a claim, correct?

15    A.    Correct.

16    Q.    Okay. And it also encourages people who witness these

17    acts to file claims on behalf of other -- of other employees

18    to help prevent such sexual harassment in the future,

19    correct?

20    A.    Correct.

21    Q.    Now, provision one states that whenever -- whenever

22    possible the victim should directly inform the harasser that

23    the conduct is unwelcome, is that correct?

24    A.    Yes.

25    Q.    Now, it -- if I go to the next page, the -- the second

1   -- the second paragraph has a provision, however, that states

2   if your immediate supervisor is the alleged harasser, that

3   you should skip that supervisor and go onto the next person

4   in chain of command, correct?

5   A.   Correct.

6   Q.   Okay.  And this is what you teach your cadets in the

7   Academy of how to approach a sexual harassment problem in the

8   Jail, correct?

9   A.   Correct.

10  Q.   Now, the supervisor or the next in command that a person

11  notifies is to acknowledge receipt of the sexual harassment

12  complaint form and -- and sign it, correct?

13  A.   Correct.

14  Q.   Right.  And I skipped a step.  So the -- in order to

15  make a complaint, the employee should fill out the complaint

16  form that is attached to this General Order, correct?

17  A.   Correct.

18  Q.   And it is attached to the back and it looks like this,

19  correct, your Honor -- or correct, Miss Passananti?

20  A.   Correct.

21  Q.   Okay.  And that supervisor or next in command that you

22  notify is to write up a report and submit that complaint to

23  the Inspector General's office through Internal Affairs,

24  correct?

25  A.   Correct.

1    Q.    Okay.  Now, this wasn't always the way for sexual

2    harassment complaints, correct?

3    A.    Correct.

4    Q.    It used to go just to Internal Affairs, correct?

5    A.    That is correct.

6    Q.    All right.  And at some point along the line somebody

7    determined that that wasn't an effective way of dealing with

8    these complaints, correct?

9    A.    Correct.

10   Q.    And so they -- for sexual harassment claims in

11   particular the Sheriff's Office instituted a new policy that

12   directed the complaints away from the Internal Affairs

13   Department to the Office of the Inspector General, correct?

14   A.    Correct.

15   Q.    Because Internal Affairs departments are -- are housed

16   in each of the little departments, correct?

17   A.    That is correct.

18   Q.    So if Internal Affairs -- if, say, something happened in

19   their reporting, the Internal Affairs Department for -- that

20   would have been -- that would have been responsible for that

21   complaint was the Internal Affairs Department of just DCSI,

22   correct?

23   A.    Correct.

24   Q.    And at some point it was determined that was too close

25   to the issue for sexual harassment, correct?

1    A.   Well, I am not --

2              MR. CASSON:  I am going to object to speculation,

3    your Honor.

4              THE COURT:  Hold on a second, please.

5              MR. HALLSTEN:  Your Honor, I will withdraw it.

6              THE COURT:  Okay.

7    BY MR. HALLSTEN:

8    Q.   So the policy was changed to take it away from the

9    individual Internal Affairs departments and put in the

10   overarching Office of the Inspector General, correct?

11             MR. CASSON:  Object again, your Honor.

12   Speculation.

13             THE COURT:  No, it is not speculation.  There was

14   extensive direct examination on this point.  He is entitled

15   to inquire.  The objection is overruled.

16   BY THE WITNESS:

17   A.   Correct.

18   BY MR. HALLSTEN:

19   Q.   And this was done to provide some measure of protection

20   to the employee, correct?

21   A.   I am not sure of what -- how -- why it was devised.

22   Q.   Now, once the Office of the Inspector General gets the

23   complaint, they are instructed to promptly review all claims

24   of sexual harassment, correct?

25   A.   That is what the policy says.

1    Q.    Okay.  And the Inspector General's office will be

2    responsible for the review of the sexual harassment

3    investigation, correct?

4    A.    That is what the policy says, correct.

5    Q.    But after the Office of the Inspector General completes

6    the investigation, they will advise the Sheriff and the

7    department head or designee of the findings, correct?

8    A.    That is what the policy says, correct.

9    Q.    And this policy further provides in No. 9 that after the

10   -- the employee who has made the complaint of sexual

11   harassment receives the findings in the case, that the

12   department head or designee is required to follow-up with

13   that person six weeks after the findings and determine

14   whether or not the behavior has been rectified, correct?

15   A.    That is what the policy states, that's correct.

16   Q.    Okay.  And that is what you teach your cadets in the

17   Training Academy, correct?

18   A.    Yes, I teach them the policy.

19   Q.    Okay.  Now, in your case, Miss Passananti, you have

20   testified that Mr. Sullivan had said mean words to you

21   repeatedly, correct?

22   A.    That is correct.

23   Q.    And that your testimony today is that you found those to

24   be sexually harassing conduct, correct?

25   A.    That is correct.

1   Q.   Okay.  Now, where is your filled-out complaint form in
2   this case?
3   A.   I wrote a document that you have in your possession that
4   is -- was my complaint.
5   Q.   You wrote what document?
6   A.   It was a document that you have in your possession.
7   Q.   What -- what is the title of the document?
8   A.   I -- I don't know.  You have it in your possession.  You
9   showed it to me.
10  Q.   Which -- which document are you referring to?  Will you
11  describe it.
12  A.   Document that I sent to Dan Gallagher.
13  Q.   All right.  So the letter you wrote to Dan Gallagher --
14  A.   That's correct.
15  Q.   -- is your complaint form in this case?
16  A.   That is correct.
17  Q.   Okay.  Now, you see the complaint form on the screen,
18  right?
19  A.   Yes, I do.
20  Q.   And you read the General Order that said that you are to
21  complete the sexual harassment complaint form and give it to
22  your supervisor and/or your supervisor's supervisor, correct?
23  A.   That is what the policy states, correct.
24  Q.   Right.  Now, you testified -- now, did you complete this
25  form in this case?

1   A.   No, I did not.

2   Q.   Did you complete this form when Mr. Sullivan called you

3   a bitch?

4   A.   No, I did not.

5   Q.   Did you complete this form when Mr. Sullivan allegedly

6   accused of you sleeping with the inmate?

7   A.   No, I did not.

8   Q.   Did you submit this form at any other time when Mr.

9   Sullivan said anything of an inappropriate nature to you

10  based on your gender?

11  A.   No, I did not.

12  Q.   And however you state that, you did write something,

13  right?  Your complaint you testified is this -- is this

14  letter to Dan Gallagher?

15  A.   That's correct.

16  Q.   Okay.  And do you recognize -- is that the front page of

17  the letter that you say is your complaint in this case?

18          THE COURT:  Hold on a second, gentlemen.

19          Do you recognize that?

20          THE WITNESS:  Yes, I do.

21          THE COURT:  What are you calling that?  Are you not

22  -- do you have an exhibit mark on that?

23          MR. HALLSTEN:  This is -- this is -- this is a

24  letter dated August 17th, 2005, from Miss Passananti to Dan

25  Gallagher.

```
1              THE COURT:  That is September 17th?
2              MR. HALLSTEN:  August 17.
3              THE COURT:  August -- I got it.  Are you moving the
4     admission of that?
5              MR. HALLSTEN:  Pardon me, your Honor?
6              THE COURT:  Are you moving the admission of that
7     exhibit?
8              MR. HALLSTEN:  Yes, sir.
9              THE COURT:  Any objection, Mr. Casson?
10             MR. CASSON:  No objection, Judge.
11             THE COURT:  That exhibit, letter 8/17/10 (sic),
12    will be admitted.
13         (Above-named exhibit will be received in evidence.)
14    BY MR. HALLSTEN:
15    Q.   Now, Miss Passananti, this doesn't look like the sexual
16    harassment complaint register form that is attached to the
17    back of the General Order, does it?
18    A.   No, it does not.
19    Q.   And who is Dan Gallagher?
20    A.   Dan Gallagher is -- was the Sheriff's special counsel.
21    Q.   Okay.  And how do you -- how did you come to an
22    understanding that that was the Sheriff's special counsel?
23    A.   Because Deputy Chief Rick Campillo advised me that he
24    was the Sheriff's special counsel.
25    Q.   And you testified earlier that -- that Dan Gallagher did
```

1    not work in the Sheriff's Office, correct?

2    A.   That is correct.

3    Q.   So Dan Gallagher is not your supervisor, is he?

4    A.   No, he is not.

5    Q.   And he is not your supervisor's supervisor, is he?

6    A.   No, he is not.

7    Q.   Okay.  Now, it is -- this front -- I would like to ask a

8    few questions on the letter.  This is your complaint,

9    correct?

10   A.   That along with the letter that is attached to it, yes.

11   Q.   Okay.  Now, this is a -- this is a nine -- what did you

12   testify it was, seven, eight -- nine-page letter detailing

13   all the harassment involved that Mr. Sullivan was doing to

14   you, correct?

15   A.   Well, I testified that it was a document that was

16   stating what Mr. Sullivan was doing, yes.

17   Q.   And when you say what "Mr. Sullivan was doing," you --

18   your -- you are referring to all the times when Mr. Sullivan

19   has referred to you in a sexually discriminatory manner,

20   correct?

21   A.   No, I identified specifically what was going on in

22   August of 2005.

23   Q.   Oh, so in August of 2005 you detailed every incident

24   Mr. Sullivan had -- in which Mr. Sullivan had referred to you

25   in a sexually discriminatory manner, correct?

1   A.   No, I did not.  I gave the synopsis of what was going on
2   in the situation in August of 2005.
3   Q.   And you -- in August of 2005, we heard testimony that
4   that was when Mr. Sullivan allegedly accused you of sleeping
5   with an inmate, right?
6   A.   Yes, sir.
7   Q.   So you made sure that you put that accusation in this
8   letter, correct?
9   A.   I am not sure if that accusation is in that letter or
10  not.  I just wanted somebody to open up an investigation, as
11  I testified to.
12  Q.   Okay.  So you -- you state that you put -- that you
13  wanted somebody to open up an investigation in this case,
14  correct?
15  A.   That's correct.
16  Q.   And what type of investigation were you requesting?
17  A.   Any investigation to look into what he was doing to me.
18  Q.   Well, I mean did you want an investigation into -- did
19  you want -- did you request an investigation into Mr.
20  Sullivan's behavior towards you in the workplace?
21  A.   Yes, anyone -- yes.
22  Q.   Okay.  Now, this is Page 1 of your letter, Miss
23  Passananti.  Can you see it clearly?
24  A.   Yes, I can see it clearly.
25  Q.   Okay.  Where is it on this page that you state that

1    Mr. Sullivan is sexual -- is -- is subjecting you to sexual

2    discriminatory remarks and that you want an investigation of

3    Mr. Sullivan's behavior towards you?

4    A.    That was a cover letter to Mr. Gallagher.

5    Q.    This is the cover -- I believe this is the cover letter,

6    am I correct?

7    A.    That's correct.

8    Q.    Okay.  Where does it say that on this cover letter?

9    A.    It doesn't say that on the cover letter.

10   Q.    Okay.  Well, then let's go to Page 1 of your letter.

11   All right.  I am going to go half page so we can make sure we

12   see it.  This is Page 1 of your letter, correct?

13   A.    That is correct.

14   Q.    Okay.  Where on the top half of this page do you state

15   to Mr. Gallagher Mr. Sullivan is -- is -- is making sexually

16   harassing comments to me or treating me in a discriminatory

17   manner and I would like an investigation?

18   A.    It doesn't say that on there.

19   Q.    Okay.  Do you want me -- I am going to slide up to the

20   bottom half of the page.

21   A.    Okay.

22   Q.    Okay.  Where in there in the bottom half of Page 1 does

23   it state that Mr. Sullivan is -- is treating me in a sexually

24   discriminatory manner and I would like an investigation of

25   his conduct towards me?

Passananti - Cross 80

1    A.   This is just an overview of what was going on.

2    Q.   Okay.  Do you want me to go to the next page, Miss

3    Passananti?

4    A.   If you would like.

5    Q.   Okay.  This is Page 2.  Where on the top half of Page 2

6    do you notify or do you request of Mr. Gallagher that

7    Mr. Sullivan is treating you in a sexually discriminatory

8    manner and you want his behavior investigated?

9    A.   I -- I don't believe it says it on that page.

10   Q.   Okay.  Do you want me to -- do you want to double-check

11   the bottom of the page too?

12   A.   No, it still -- it is still an explanation of what was

13   going on.

14   Q.   Okay.  Then I will continue to move forward.  That is

15   Page 3 of your letter to Mr. Gallagher.  This is the top

16   half.  Where on this page does it state that you have been

17   subjected to sexually discriminatory comments by Mr. Sullivan

18   and that you want his behavior investigated?

19   A.   It doesn't say it on the top.

20   Q.   Okay.  I will slide to the bottom.

21   A.   No, it still -- it is still an overview of the things

22   that he was doing.

23   Q.   Okay.  And when you say "things that he was doing," it

24   was referring to the investigation or the -- the incident

25   around Spiewak, correct?

1   Q.   Okay.  All right.  This is Page 4, Miss Passananti.  I

2   am going to stop fiddling with it.  There.

3            Where is it on the top of Page 4 does it say that

4   you say to Dan Gallagher, Mr. Sullivan is treating me in a

5   sexually discriminatory manner and I want his behavior

6   investigated?

7   A.   It is still -- it is still an overview of what he was

8   doing as far as that Spiewak situation.

9   Q.   Okay.  I am going to move to the bottom of the page.

10  Where does it say that in there?

11  A.   It says what was going on with Dan Romeo as far as the

12  Spiewak situation is concerned.

13  Q.   Right.  But does it say that you -- Mr. Sullivan is

14  treating me in a sexually discriminatory manner and I want

15  his behavior investigated?

16  A.   No.  The whole document implies that.

17  Q.   Oh, did we miss something?  Did I miss you making an

18  allegation about Mr. Sullivan in here?

19  A.   No.

20  Q.   Okay.

21  A.   It was a synopsis of what was going on with that

22  situation.

23  Q.   All right.  Here is Page 5, Miss Passananti.  Where is

24  it that you alert Dan Gallagher of Mr. Sullivan treating you

25  in a sexually discriminatory manner and that you request that

1   his behavior be investigated?

2   A.   Just reviewing that -- what the things that he was

3   having other people do in his behalf.

4   Q.   So it is not in this page either?

5   A.   Well, the things that he was doing are on this page,

6   yes.

7   Q.   Well, you -- I asked you whether or not is -- whether or

8   not this page contains the statement or the statement that

9   Mr. Sullivan is treating me in a sexually discriminatory

10  manner and I want his behavior investigated.

11  A.   No.

12  Q.   All right.  Here is the bottom of Page 5.

13  A.   It just says behavior is continuing.

14  Q.   Where is it in this letter stated, Mr. Gallagher,

15  Mr. Sullivan is behaving in a sexually discriminatory manner

16  towards me and I want his behavior investigated?

17  A.   Well, it says, "Approximately ten minutes later Pat

18  Sullivan called me in his office and began screaming at me.

19  He screamed, 'You are on dangerous ground again.'  And I

20  asked what.  He screamed, 'Shut the F up" and began screaming

21  that I let Acevedo get me in trouble again.  I said, 'What

22  are you talking about?'  He screamed I said, "Shut up you

23  YMB."

24  Q.   All right.  So let's continue on Page 6.  All right.  So

25  where on this page do you say to Mr. Gallagher, I --

1    Mr. Sullivan has been treating me in a sexually
2    discriminatory manner and I want his behavior investigated?
3    A.   Those words are not on this -- on this page.
4    Q.   Okay.  And that what we looked at on Page 5 was the only
5    example that you provided in that letter of Mr. Sullivan
6    behaving in an improper manner towards you, correct?
7    A.   No.
8    Q.   Where were there other examples?  Did I miss them?
9    A.   The fact that he had one of his chiefs telling
10   investigators to change their to-froms to jam me would be bad
11   behavior also.
12   Q.   Okay.  Here is the bottom of this Page 6.  Okay.  Where
13   in this page does it say Mr. Sullivan is treating me in a
14   sexually discriminatory manner and I want his behavior
15   investigated?
16   A.   It doesn't say those words.  It simply demonstrates his
17   behaviors.
18   Q.   Okay.  It does not -- okay.  All right.  Let's continue.
19   Let's go to Page 7.  Where in there does it contain language
20   demonstrating that you were telling Mr. Gallagher,
21   Mr. Sullivan is treating me in a sexually discriminatory
22   manner and you want his behavior investigated?
23   A.   Again, it is just an overview of his bad behavior.
24   Q.   Same thing for the bottom?
25   A.   That is correct.

1    Q.   This is Page 8.  Is -- where in this page did you state,

2    Mr. Sullivan is behaving in a sexually discriminatory manner

3    and you want his behavior investigated?

4    A.   Again, it doesn't say those exact words.  It simply

5    demonstrates his bad behavior.

6    Q.   Okay.  You say it doesn't state those exact words.  Does

7    it say any words similar?

8    A.   No, but I assume that somebody that read that would see

9    that he was exhibiting bad behaviors.

10   Q.   Where in here did you state that Mr. Sullivan is

11   behaving in a sexually discriminatory manner and you want his

12   behavior investigated?

13   A.   Again, it doesn't say those exact words.  It simply

14   demonstrates his bad behaviors.

15   Q.   Okay.  Let's -- let's look about Page 8.  It says, "I

16   would never do anything that would in any way harm this

17   Department.  I feel it is my responsibility to put someone

18   that has their own agenda and does not take into account

19   repercussions for the Sheriff's on notice.  This is one of

20   those times."  That -- where in that sentence do you request

21   that Mr. Sullivan be investigated?

22   A.   Mr. Hallsten, it doesn't say those words exactly.  It

23   simply -- this document simply states his bad behaviors.

24   Q.   All right.  I have one -- this is the last page of your

25   letter.  All right.  The last page of your letter.  Where on

1    this letter do you state that Mr. Sullivan was engaged in
2    sexually discriminatory behavior and you wanted him
3    investigated?
4    A.   Again, it doesn't state those words exactly.  It simply
5    demonstrates his bad behaviors.
6    Q.   Now, you testified earlier that this was your complaint
7    form, Miss Passananti?
8    A.   Yes, it was definitely a complaint.
9    Q.   And if you were called -- if you could -- in your review
10   of that, because most of that letter refers to how you should
11   not be found guilty of the Spewack incident, isn't that
12   correct?
13   A.   No, it does not say that in there that I should not be
14   found guilty.  It stated how he behaved about that situation.
15   Q.   Now, you were investigated for the Spiewak incident,
16   correct?
17   A.   That is correct.
18   Q.   Okay.  And what were the actual charges related to
19   Inmate Spiewak?
20   A.   There was a rules of conduct for allowing somebody that
21   was caught tampering with their urine to be dismissed and
22   that I allowed investigators to circumvent the chain of
23   command by talking to them.
24   Q.   All right.  It had nothing to do with you sleeping with
25   an inmate, correct?

1   A.   No.

2   Q.   All right.  Let's go back to this -- this complaint

3   letter.  Okay.  Now, we looked through this entire letter,

4   Miss Passananti, and nowhere in that letter does it request

5   that Mr. Sullivan's behavior be investigated, correct?

6   A.   No, it simply stated his bad behaviors.  And that should

7   have definitely opened up an investigation.

8   Q.   And in that letter you stated -- you say it describes

9   his bad behavior.  In that letter you only attribute one

10  quote to him where he allegedly calls you a bitch, correct?

11  A.   In that one situation that is correct.

12  Q.   That's right.  And this was your complaint form, your

13  opportunity to explain all the things Mr. Sullivan was doing,

14  all of the comments that you claims -- you claim to this jury

15  that he had made in the past and you only identify one

16  statement that he has made, correct?

17  A.   That document was immediately requested to open up an

18  investigation.  It did nothing.

19  Q.   Wait, wait.  What do you mean that document was

20  requested to mean -- what are your referring to?

21  A.   That that document -- if -- if the policy would have

22  been followed, that document would have caused an

23  investigation to be opened, which it did not.

24  Q.   If the policy would have been followed, is that your

25  testimony?

1  A.   Well, if anything -- if anyone that saw that document

2  would see that he had demonstrated very bad behaviors, it

3  would have called upon someone to open an investigation.

4  Q.   We just looked at the policy, Miss Passananti.

5  A.   That's correct.

6  Q.   And the policy is very clear.  The policy says that you

7  are to notify your supervisor or your supervisor's

8  supervisor, complete the sexual harassment complaint form and

9  submit that to one of those two people.  That is what the

10 policy says?

11 A.   That's correct.  And the procedure would be -- would go

12 the way it was supposed to go in the Sheriff's Department,

13 that would have been adequate.

14 Q.   Right.  However, you didn't allow that to happen in this

15 case?

16 A.   I did allow that to happen.

17 Q.   You did not.  You already testified --

18 A.   I followed the policy.  I followed the policy.  I -- I

19 wrote a document requesting somebody to help me.

20 Q.   Miss Passananti, you did not follow the policy.  You

21 were required to fill out that form and submit it to either

22 your supervisor or your supervisor's supervisor.  You did not

23 do that, correct?

24 A.   But I did follow the policy because I verbalized what

25 was going on also to other people.

1    MR. HALLSTEN:  Objection.  Move to strike the

2    answer as nonresponsive.

3    THE COURT:  Could I hear the question, please.

4    (Record read as requested.)

5    THE COURT:  I think you can answer that yes or no,

6    Miss Passananti.

7    THE WITNESS:  No.

8    THE COURT:  You were not required to fill out the

9    form?

10    THE WITNESS:  No.

11    THE COURT:  Okay.

12   BY MR. HALLSTEN:

13   Q.   Now, Miss Passananti, again, you wrote that letter -- it

14   is your testimony today that you wrote that letter, sent it

15   to Dan Gallagher, an employee who doesn't work for the

16   Sheriff's Office, and that was your attempt to highlight all

17   the sexually discriminating behavior that Mr. Sullivan

18   subjected to -- had allegedly subjected you to that you told

19   the jury about here today, correct?

20   A.   No, that is not what I said.

21   Q.   But this is your one complaint form, correct?

22   A.   That is correct.

23   Q.   Where in this complaint form do you inform Mr. Gallagher

24   of the allegedly harassing comments Mr. Sullivan was making

25   to other people?

1    A.    Pardon me?

2    Q.    Well, you -- your attorney asked you if he was making

3    comments to other people, and you testified, "Yes."  Where is

4    the -- where is the comments about that -- about his other --

5    about other people in this letter?

6             MR. CASSON:  Your Honor, I am going to object.

7    The --

8             THE COURT:  Yeah, I --

9             MR. CASSON:  The time line.

10            THE COURT:  Well, I reversed my ruling and told you

11   you could go into that Mr. Casson, but you never did.  So

12   that really has never been raised.

13            MR. HALLSTEN:  All right.

14   BY MR. HALLSTEN:

15   Q.    Now, you also testified that it was an allegedly

16   terribly traumatic event for you to have been told by Mr.

17   Sullivan that you were sleeping with that inmate, correct?

18   A.    That is correct.

19   Q.    Okay.  And that -- and that was -- and that was so

20   traumatic to you that you made sure to put that in that

21   letter to Mr. Gallagher, correct?

22   A.    I absolutely did not put that in somewhere that --

23   someone else was going to be able to see that information.

24   Q.    So you chose not to put that allegation in the letter?

25   A.    That is correct.

1    Q.    So you understand the purpose of sexually harassment

2    policies and the nature of notice to the defendant and you

3    chose not to alert the defendant of the main allegation you

4    have raised here today, correct?

5    A.    Pardon me?

6    Q.    You --

7                 THE COURT:  Do you want the question read back?

8                 THE WITNESS:  Yes.

9         (Record read as requested.)

10   BY THE WITNESS:

11   A.    Oh, no, I told him that day.

12   BY MR. HALLSTEN:

13   Q.    You told who that day?

14   A.    The defendant.  I told the defendant that day that that

15   is -- that was absolutely unwarranted.

16   Q.    Oh, I am referring to Mr. Gallagher in your complaint

17   letter, Miss Passananti.  You deliberately excluded that

18   allegation from your complaint to Mr. Gallagher, correct?

19   A.    Yes, I was mortified, yes.

20   Q.    So the defendant would have no way of knowing that this

21   allegation even existed?

22   A.    Well --

23                MR. CASSON:  I am going to object, your Honor.  It

24   is contrary to her --

25                THE COURT:  If you have an objection, you can state

1    it.  I will ask you not to make a speaking objection.

2                    MR. CASSON:  Yes.

3                    THE COURT:  What is the basis?

4                    MR. CASSON:  It is the form of the question, your

5    Honor.

6                    THE COURT:  Rephrase the question.

7    BY MR. HALLSTEN:

8    Q.   You deliberately excluded the fact that Mr. Sullivan had

9    accused you -- allegedly accused you of sleeping with an

10   inmate from your letter which you claim is your complaint in

11   this case, correct?

12   A.   That is correct.

13   Q.   Okay.  Now, the -- we talked a little bit about it.  The

14   allegation was that you -- you were charged with improperly

15   allowing your subordinates to release a participant who had

16   tampered with his urine, correct?

17   A.   That is correct.

18   Q.   In fact, it wasn't just you who was charged with

19   violating the General Orders, it was also your subordinate

20   investigators, correct?

21   A.   That is correct.

22   Q.   Okay.  And it was -- it was their actions in this case

23   that -- let me strike that, your Honor.

24                    Okay.  I believe you testified that you believed

25   that allowing a participant, an inmate participant -- a

Passariant - Cross                                          92

1    participant to be released, even though he had tampered with

2    his urine, was not in violation of any order, written or

3    verbal, correct?

4    A.    That is correct.

5    Q.    Okay.  Now, you had the benefit of a complete Office of

6    the Inspector General's investigation in this case, correct?

7                 MR. CASSON:  Objection to form, your Honor.

8                 THE COURT:  Overruled.

9                 THE WITNESS:  I had what?

10   BY MR. HALLSTEN:

11   Q.    There were -- the Office of the Inspector General did a

12   complete investigation into this allegation, correct?

13   A.    That is correct.

14   Q.    And they took the witness statements of each of your

15   investigators and yourself, correct?

16   A.    That is correct.

17   Q.    And they took documentary evidence from each of your

18   investigators and from yourself and from Mr. Sullivan,

19   correct?

20   A.    That is correct.

21   Q.    Okay.  And in that investigation it was -- were

22   handwritten notes that you wrote at the end of one of the

23   meetings from the day reporting center, correct?

24   A.    That is correct.

25   Q.    Okay.  And those -- you -- your testimony was that there

1    was no verbal order stating that people who tamper with the

2    inmates -- participants who tamper with their urine should be

3    returned back to the Jail, correct?

4    A.   That is correct.

5    Q.   Now.  Do you recognize these?

6              THE COURT:  Is there an objection to this?

7              You got to identify it by exhibit designation of

8    some type.  And then we have to determine whether there is an

9    objection before it is published to the jury.

10             MR. HALLSTEN:  All right.  Your Honor, these are

11   the handwritten notes of Miss Passananti that were sub --

12   were part of the IAD -- the OIG report into the Spiewak case

13   and were attached to her report and considered in the

14   investigation.

15             THE COURT:  Mr. Casson, any objection to the

16   admission of plaintiff's handwritten notes?

17             MR. CASSON:  Yeah, I -- to admission, yes, your

18   Honor.  It is --

19             THE COURT:  Basis?

20             MR. CASSSON:  They weren't disclosed as -- as an

21   exhibit.

22             MR. HALLSTEN:  Your Honor, the plaintiff -- the

23   defendant has proposed the entire Spiewak file be admitted.

24   And plaintiff objected based on relevance and eliminated it

25   from the pretrial order without our consent.

1    THE COURT:  All right.  That exhibit is admitted.

2         The objection is because it wasn't disclosed,

3    Mr. Casson?

4         MR. CASSON:  Yeah, he didn't put it on the pretrial

5    order.  That is --

6         THE COURT:  He has just explained why.  But these

7    are your client's notes.

8         MR. CASSON:  These are.  This is part of the

9    investigation from the OIG, that's correct.

10        THE COURT:  And -- let me see you at side bar.

11     (Proceedings heard at side bar:)

12        THE COURT:  We got to do something so that you can

13   be heard here.  It is a little over this way.

14        MR. CASSON:  As your Honor knows, everybody has all

15   of these documents.

16        THE COURT:  What is the surprise?

17        MR. CASSON:  It just wasn't on the pretrial order.

18        MR. HALLSTEN:  In our last --

19        THE COURT:  I don't know if she can.

20     (Discussion held off the record.)

21        THE COURT:  Why don't you identify yourselves

22   before you speak.  So say your name.  Okay.

23        MR. HALLSTEN:  Don Hallsten on behalf of defendant.

24        MR. CASSON:  Luke Casson for the plaintiff.

25        THE COURT:  No, no, before you speak.  She can't

Passananti - Cross

1   see who is speaking because her back is to us.

2           Okay.  So go ahead.

3           MR. HALLSTEN:  Don.  Judge, in our last back and

4   forth in the pretrial I had put italics under -- because

5   Mr. Casson had several of the exhibits from this report

6   already in his exhibit list.

7           THE COURT:  All right.

8           MR. HALLSTEN:  And I proposed we put the entire

9   exhibit in there as a exhibit.  And Mr. Casson objected based

10  on relevance to the whole exhibit.

11          MR. CASSON:  And hearsay.  There was some hearsay

12  problems.

13          MR. HALLSTEN:  And when Mr. Casson filed the joint

14  pretrial order, he neglected to keep those objections.

15          THE COURT:  So you deleted them.

16          MR. CASSON:  No, no, I didn't delete anything from

17  the pretrial.

18          MR. HALLSTEN:  Well, then we proposed -- and these

19  are all part of this.

20          THE COURT:  Wait.  Wait a minute.  Stop.  When you

21  conferred regarding the pretrial order, you told the

22  defendant -- told the plaintiff the defendant wanted this

23  information as part of the entire file, the entire

24  investigation file, you wanted the entire file into evidence?

25          MR. CASSON:  That's correct.

1        THE COURT:  The plaintiff objected on grounds of

2   hearsay as to some and relevance to generally?

3        MR. CASSON:  Correct.

4        THE COURT:  That -- your proposal and his objection

5   were never included in the pretrial order, is that correct?

6        MR. HALLSTEN:  And that is -- that is correct.

7        THE COURT:  Okay.

8        MR. CASSON:  My -- sent me over --

9        THE COURT:  Did he tell you that he wanted to put

10  it in and do you say you objected?

11       MR. CASSON:  I said I objected.  I am not putting

12  it in my exhibits.

13       THE COURT:  Well, but you didn't put in the

14  pretrial order as something he wanted to offer with your

15  objection is what he is saying.

16       MR. CASSON:  No, he could have put it -- if he

17  wanted to put it in --

18       THE COURT:  Oh, this is silliness.

19       MR. CASSON:  Yeah.

20       THE COURT:  This is just silliness right now.

21       MR. CASSON:  I agree.  Your Honor, I am not making

22  an issue of --

23       THE COURT:  Well, you are making an issue.  You

24  just objected.

25       MR. CASSON:  I objected to it because it is not in

1    the pretrial order.

2              THE COURT:  Because you didn't put it in.

3              MR. CASSON:  It is not my -- it is on my exhibit

4    list, Judge.

5              THE COURT:  Well, you could have put in that it was

6    his and he objected.

7              MR. CASSON:  Well, he put in in his -- in his

8    exhibit list three things.  Judge, it is not my fault -- my

9    fault that he -- I don't know what he wants.

10             THE COURT:  I think there is some gamesmanship

11   here, and it is really disappointing.

12             MR. CASSON:  Judge, it is not gamesmanship.

13             THE COURT:  Are you telling me now that you are

14   surprised that he is going to offer this as an exhibit?

15             MR. CASSON:  I did not say that.  He showed it to

16   --

17             THE COURT:  Keep your voice down.

18             MR. CASSON:  Judge --

19             THE COURT:  Wait, wait.  Look.

20             MR. CASSON:  We talked about it.

21             THE COURT:  He moved the admission of this.  You

22   objected on the grounds it wasn't in the pretrial order.  Now

23   the clear implication of that is that you were somehow taken

24   aback, you were somehow surprised because it wasn't in the

25   pretrial order.  If that is not the case, what did you even

1    bother to say it for?

2              MR. CASSON:  Because I don't know what he is

3    offering --

4              THE COURT:  Keep your voice down.

5              MR. CASSON:  I don't know what he is offering it

6    for.

7              THE COURT:  That is a separate issue, what he is

8    offering it for.  We are not even at that stage.  The clear

9    implication for your objection is, Judge, it wasn't in the

10   pretrial order.  I am surprised he is offering this as an

11   exhibit.  Now I find out there was an elaborate colloquy

12   during the time you prepared the pretrial order when he told

13   you verbally he wanted to put it and you objected.

14             Now, this is not really genuine, Mr. Casson.

15             MR. CASSON:  May I speak?

16             THE COURT:  Sure.

17             MR. CASSON:  Judge, that is not true.

18             THE COURT:  Keep your voice down.

19             MR. CASSON:  I can't get it any lower.  That is not

20   what

21             THE COURT:  You get it lower or you won't speak at

22   all.

23             MR. CASSON:  Your Honor, this is not what happened.

24   He sent me over -- he put something into my list.  I said I

25   am not putting this.

1    THE COURT:  Did he tell you that he wanted to offer

2    the entire file?

3          MR. CASSON:  He state he wanted --

4          THE COURT:  Can you answer me yes or no.

5          MR. CASSON:  Yes.

6          THE COURT:  Your objection is overruled.

7          MR. CASSON:  Your Honor, I would still like to

8    make a record on it.  I am not finished making my record.

9          THE COURT:  You are on very thin ice.

10         MR. CASSON:  I understand, your Honor.  I have been

11   accused of playing some game.

12         THE COURT:  Listen --

13         MR. CASSON:  I would just like to be heard, Judge.

14         THE COURT:  You made a comment at the pretrial

15   conference regarding Mr. Hallsten, that he had no substantive

16   evidence to offer.  That was patently, blatantly false and an

17   obvious attempt to mislead.  And I let it slide once.  I am

18   telling you you have a obligation to be truthful and

19   forthright with me.  Your opponent has just told me that he

20   discussed specifically he wanted to put the entire file,

21   including this exhibit into evidence, and you objected.

22         Now, is that or is that not true?

23         MR. CASSON:  He -- yes.

24         THE COURT:  Okay.

25         MR. CASSON:  He wants to put it into evidence.  I

1    don't have a problem with that.

2                THE COURT:  Let's go.

3                MR. CASSON:  I have an objection.

4                THE COURT:  Then why?

5                MR. CASSON:  I objected because it sounded like he

6    was using it for impeachment purposes.

7                THE COURT:  This is silliness.

8                MR. CASSON:  It was for admission.

9                THE COURT:  It is her handwritten notes.  It is an

10   admission by a party opponent.  This is your client and her

11   handwriting.

12               MR. CASSON:  I understand that, Judge.

13               THE COURT:  This is silliness.  Now you don't know

14   why it would go in as impeachment.

15               MR. CASSON:  That is not what I am asking, Judge.

16               THE COURT:  That is what you just --

17               MR. CASSON:  I just said I didn't know why, if he

18   was offering it for impeachment or offering for substance.

19               THE COURT:  What difference does it make?  Your

20   first objection was that it wasn't in the pretrial order.

21   And the implication of that is that your opponent is trying

22   to pull a fast one.

23               MR. CASSON:  No, Judge, it is not.

24               THE COURT:  Okay.  Let's go.

25           (Proceedings heard in open court:)

1      THE COURT:  Your objection is overruled.

2      You are moving the admission of Exhibit N,

3  plaintiff's handwritten notes?

4      MR. HALLSTEN:  Yes, your Honor.

5  BY MR. HALLSTEN:

6  Q.   Okay.  Now, I believe before we got sidetracked, Miss

7  Passananti, that you recognized this handwriting and these

8  notes, correct?

9  A.   That is correct.

10 Q.   Okay.  And you see the date on there as May 19th of

11 2003, correct?

12 A.   Correct.

13 Q.   And at 10:30, correct?

14 A.   Yes.

15 Q.   And it says, "DCSI Director BD, Case investigator

16 staff."  Is that some type of meeting that was occurring,

17 Miss Passananti?

18 A.   Yes, it was a meeting with the new provider that was

19 just coming into day reporting.

20 Q.   Okay.  Now, I am going to flip to Page 4 of these notes

21 -- I think it is Page 4.  Let's see.  All right.  Page 4 of

22 these notes.  And see at the top --

23 A.   Yes.

24 Q.   -- where it says, "Director -- after meeting Director

25 Sullivan, urine tamper, right back to the Department of

1    Corrections, bring in bottles."  Isn't that your handwriting
2    Miss Passananti?
3    A.    "Bring in bottle."
4    Q.    Yeah.  And it says, "Urine tamper, right back to DOC."
5    And that is referring to the participant, isn't it, Miss
6    Passananti?
7    A.    Yes, that was Director Sullivan's understanding, yes.
8    Q.    And that was a verbal instruction to you that if there
9    was urine tampering, that the participant be sent right back
10   to the Department of Corrections, correct?
11   A.    No, that is not correct.
12   Q.    Well, what does that say, Miss Passananti?
13   A.    That was part -- first of all, it says what I wrote
14   down.
15   Q.    Okay.  I will put it back on.  I apologize.
16   A.    It was part of the discussion.  That was part of the
17   discussion.  That was -- that was his provision.  That was
18   what he offered at the meeting.
19   Q.    Okay.  Mr. Sullivan wanted -- if there -- Mr. Sullivan
20   stated if there was a urine tamper, that day reporting, which
21   he was the Director, that it is -- the participant was to be
22   sent right back to the the Department of Corrections?
23   A.    No, that is what he offered at the meeting.  He did not
24   say from this point forward all urine tampers go right back
25   to DOC.  No, he did not say that.

1    Q.    Despite what your notes say?

2    A.    No, not -- that is exactly what my note says.

3    Q.    Now, the Office of the Inspector General did a complete

4    investigation and interviewed a lot of witnesses, including

5    yourself, right -- correct, Miss Passananti?

6    A.    That is correct.

7    Q.    Okay.  And you had an opportunity -- you were actually

8    interviewed by investigators in this case, correct?

9    A.    That is correct.

10   Q.    And they asked you questions about the investigation and

11   you were allowed to give answers, correct?

12   A.    That is correct.

13             MR. HALLSTEN:  Just a -- may I have a moment, your

14   Honor?

15             THE COURT:  Yes.

16             MR. HALLSTEN:  Thank you.

17        (Discussion held off the record.)

18             MR. HALLSTEN:  Your Honor, this exhibit is the

19   statement given by Miss Passananti on September 13th, 2005,

20   to the Office of the Inspector General investigators

21   regarding the allegations in the Spiewak investigation, was

22   maintained -- was part of the Investigator General's file as

23   part of that entire exhibit that was proposed to be --

24             THE COURT:  Can you tell me the date of the

25   statement.

1          MR. HALLSTEN:  Yes, sir, it is -- yes, your Honor,

2     it is 13 September 2005.

3          THE COURT:  You are moving the admission of that

4     exhibit?

5          MR. HALLSTEN:  Yes, your Honor.

6          THE COURT:  Any objection, Mr. Casson?

7          MR. CASSON:  I am assuming it is the same one from

8     the CI file, your Honor.

9          THE COURT:  Is there an objection to the admission

10    of exhibit Plaintiff's Statement 9/13/05.

11         MR. CASSON:  No.  I have had a chance to look at

12    it, your Honor, no.

13    BY MR. HALLSTEN:

14    Q.   Okay.  And at that time?

15         THE COURT:  That will be admitted as well.

16         MR. HALLSTEN:  I apologize, your Honor.  Thank you.

17         (Above-named exhibit will be received in evidence.)

18    BY MR. HALLSTEN:

19    Q.   At that time do you recall who was taking the statement

20    from you, Miss Passananti?

21    A.   Yes, I do.

22    Q.   And who was that?

23    A.   That was Investigator Pavalonis and Investigator Cleary.

24    Q.   Okay.  And at that time they asked you questions

25    regarding the urine tampering incident, correct?

Passalant - cross                    105

1   A.   That is correct.

2   Q.   Okay.  Now, this was on 13 September 2005, correct?

3   A.   That is correct.

4   Q.   So this is after the allegation that you made that

5   Mr. Sullivan had accused of you sleeping with this very same

6   inmate, correct?

7   A.   That is correct.

8   Q.   Okay.  And in this statement that you give you are

9   afforded an opportunity at the end to add anything else to

10  your statement, correct?

11  A.   That is correct.

12  Q.   Okay.  And at the time that you were being investigated

13  for this Spiewak incident, you -- by the time it was

14  September you knew this was a major investigation.  You had

15  already been temporarily transferred to SWAP during the

16  pendency of this investigation, correct?

17  A.   That is correct.

18  Q.   All right.  And you had an opportunity now with

19  Investigators Cleary and Investigators Pavalonis to lay all

20  your cards out on the table and get everything out there you

21  believe was happening to you in this Spiewak incident,

22  correct?

23  A.   That's correct.

24  Q.   And including that Mr. Sullivan had allegedly accused

25  you of sleeping with this inmate and he was trumping all

1   these charges, correct?

2   A.   That's correct.

3   Q.   Okay.  Now, when it says, "Is there anything else that

4   you would like to add to this statement, why didn't you at

5   that time -- when you had an Office of the Inspector General

6   investigator in a room with another investigator where you

7   could have explained all of the stuff hat was allegedly

8   happening to you at the -- at the hands of Mr. Sullivan, why

9   didn't you add anything to your statement?

10  A.   Because this was about the Spiewak incident.

11  Q.   Well, the Spiewak incident, according to you, involved

12  -- was allegedly involved you sleeping with the inmate --

13  participant.  Why didn't you say that Mr. Sullivan had

14  accused of you of that in relation to this incident?

15  A.   Because that wasn't the time or place to say it.

16  Q.   You had an Office of the Inspector General investigator

17  there who was investigating charges against you, the whole

18  time believing that charges should have been filed against

19  Mr. Sullivan.  You didn't take opportunity to say, hey, there

20  is something fishy going on here, this is not right, did you?

21  A.   This investigation was --

22       THE COURT:  You can answer that yes or no.

23  BY THE WITNESS:

24  A.   No.

25  BY MR. HALLSTEN:

1    Q.    Now, in November of 2005 at the conclusion of the
2    investigator general's investigation into the allegations
3    that you improperly allowed an inmate who tampered with his
4    urine to leave the Jail, what did the OIG find?
5    A.    They found me guilty.
6    Q.    Okay.  And the specific allegation was that this
7    participant had brought urine in an Elmer's Glue bottle to
8    take his test, correct?
9    A.    No, the allegation was that I let the participant go
10   that was caught tampering with their urine, in violation of a
11   direct order.
12   Q.    Okay.  Now, when you received the finding from the
13   Office of the Inspector General that had found you guilty of
14   releasing an inmate -- a participant who had tampered with
15   his urine, what did you do?
16   A.    I appealed it.
17   Q.    You sought out the appeal of another investigative body,
18   isn't that correct?
19   A.    That's correct.
20   Q.    And you submitted it to the Internal Affairs Department
21   and asked that the case be reviewed, correct?
22   A.    Correct.
23   Q.    Okay.  And when you submitted that case to the Internal
24   Affairs Department and asked that the case be reviewed, did
25   you ask them at that time to investigate any claim -- any

Passalant - cross 108

1    behavior -- any sexually discriminating behavior that you
2    allege that Director Sullivan was instigating against you?
3    A.    They all had that document that I wrote.
4    Q.    Did you request of IAD -- you specifically had the
5    wherewithal to request an appeal of your OIG investigation,
6    correct?
7    A.    Correct.
8    Q.    Okay.  Did you request an investigation of
9    Mr. Sullivan's be -- alleged behavior towards you at that
10   time?
11   A.    No.
12   Q.    And what did the IAD investigation -- appeal process
13   turn up for you?
14   A.    They concurred.
15   Q.    They concurred.  They did allow you, however, the
16   opportunity to instead of using -- be -- actually be
17   suspended, that you could just use benefit time, correct?
18   A.    Five days.
19   Q.    So you never actually missed a day of work because of
20   the finding?
21   A.    I missed five days of pay.
22   Q.    Right.  Now, once the process of the investigation and
23   the appeal were over, were you returned back to your position
24   as Deputy Director?
25   A.    Yes.

Passalant1 - cross                    109

1    Q.   Okay.  And you continued to operate as Deputy Director
2    at the Jail from approximately November 2005 to July of 2006,
3    correct?
4    A.   Deputy Director of day reporting.
5    Q.   Day reporting.  I apologize.  Thank you.
6    A.   Yes.
7    Q.   From November -- from approximately November 2005 to
8    July of 2006, correct?
9    A.   That's correct.
10   Q.   Now, at any time in November of 2005 did you fill out a
11   complaint form and submit to your supervisor or your
12   supervisor's supervisor?
13   A.   No.
14   Q.   Okay.  At any time in December 2005 did you fill out a
15   complaint form?
16   A.   No, I did not.
17   Q.   Any time in January of 2006?
18   A.   No, I did not.
19   Q.   Any time in February?
20   A.   No, I did not.
21   Q.   Any time in March?
22   A.   No, I did not.
23   Q.   April?
24   A.   No.
25   Q.   Okay.  May, June or July?

Passarahnti / cross 110

1    A.    No.

2    Q.    Now, something -- what happened to Mr. Sullivan -- what

3    is your understanding of what happened Mr. Sullivan medically

4    in July of 2006?

5    A.    He got sick and he wasn't going to come back.

6    Q.    Okay.  And so sometime in July of 2006 Mr. Sullivan went

7    out on medical leave and never -- and did not return to the

8    office, correct?

9    A.    That is correct.

10   Q.    And at no time from July of 2006 until February -- until

11   March of 2007, until the day you were terminated, did

12   Mr. Sullivan ever return back to the office?

13   A.    That's correct.

14   Q.    And during that time you were by necessity the Acting

15   Director of day reporting, weren't you?

16   A.    That's correct.

17   Q.    Because Mr. Sullivan was out on medical and you were the

18   the one left holding the department down, correct?

19   A.    Correct.

20   Q.    Now, any time after July of 2006 with Mr. Sullivan gone

21   and there being no -- no possible worry about complaining

22   about him, did you then file -- because we heard -- did you

23   then file a sexual harassment form against Mr. Sullivan?

24   A.    No, it was futile.

25   Q.    Okay.  And we read the policy earlier.  It said you had

1   365 days to complain, correct?

2   A.   That's correct.

3   Q.   Okay.  Now Mr. Sullivan is gone.  You don't have to

4   worry about him allegedly yelling at you for anything

5   anymore.  Why didn't you file a sexual harassment complaint

6   form then?

7   A.   It was futile.

8   Q.   You keep saying or you try to say that it is futile,

9   Miss Passananti.  But you never actually tried to submit a

10  complaint register form attached to the General Order, just

11  like you teach all of your cadets to do, did you?

12  A.   No.

13  Q.   Now, in February or March 2007 -- you received notice

14  that you had been terminated, correct?

15  A.   Correct.

16  Q.   And that notification stated that because of budget --

17  County budget cuts that you have been -- had been eliminated,

18  correct?

19  A.   Correct.

20  Q.   Now, at some point after that you went to the EEOC, is

21  that correct?

22  A.   That's correct.

23  Q.   And this is the first time that you ever went to the

24  EEOC on this -- on the allegations contained anywhere that we

25  have talked about today, correct?

1   A.   Yes.

2   Q.   Okay.  And -- and, in fact, if I could pull up the

3   General Order really quickly and point to C.

4           THE COURT:  Is there an objection to the admission

5   -- that is already in evidence?

6           MR. HALLSTEN:  That is already in evidence, your

7   Honor.

8   BY MR. HALLSTEN:

9   Q.   It says that you can actually go to -- the Sheriff's own

10  sexual harassment policy states that you could go to the EEOC

11  if you wanted to, correct?

12  A.   Correct.

13  Q.   And you did not choose to go to the EEOC until May 1st,

14  2007, correct?

15  A.   Until there was no fear to lose my job, that is

16  correct.

17  Q.   Okay.  So it was -- a year and a half after Mr. Sullivan

18  allegedly made that comment to you that you decided to go to

19  the EEOC, correct?

20  A.   That wasn't the only comment.

21  Q.   Well, let's take a look at this.

22          Your Honor, I have what has been marked -- or what

23  is plaintiff's EEOC charge dated May 1st, 2007.

24          THE COURT:  Any objection?

25          MR. CASSON:  No objection, your Honor.

1    BY MR. HALLSTEN:

2    Q.   This is the first page of your EEOC charge, correct?

3         Wait.  Let me get it.

4         Okay.

5         Do you recognize that document, Miss Passananti?

6    A.   Yes.

7         MR. CASSON:  Do you guys have another copy?  Do you

8    have a copy of it?

9    BY MR. HALLSTEN:

10   Q.   Now, this EEOC charge is the only time that you went to

11   the EEOC in this case, correct?

12   A.   That's correct.

13   Q.   All right.  And you wanted to state -- you -- you wanted

14   to be truthful in all of your allegations contained on this

15   charge, correct?

16   A.   Correct.

17   Q.   Okay.  And you, in fact, swear to that and affirm that

18   these statements are truthful in regards to what you are

19   alleging in this complaint, correct?

20   A.   Correct.

21   Q.   Okay.  Now, can you see on your page -- and I will zoom

22   in.

23        THE COURT:  Mr. Bowman, can you zoom in.

24        MR. HALLSTEN:  I got it.

25        THE COURT:  I think there is controls on that ledge

1    that comes out.

2              MR. HALLSTEN:  I looked.  I couldn't -- I didn't

3    recognize them.

4              THE COURT:  Okay.

5              MR. HALLSTEN:  Okay.  I got them.  Okay.

6              THE COURT:  Can you read that, folks?

7    BY MR. HALLSTEN:

8    Q.   Okay.  Okay.  That -- that is the extent of the

9    allegations you put on that charge, correct?

10   A.   Yes.

11   Q.   Okay.  Now, I want you to -- right up in the right side

12   of that page do you see where it says "Date discrimination

13   took place"?

14             THE COURT:  You can circle it.  If you touch this

15   screen, you will make a mark on it.

16             THE WITNESS:  Okay.

17   BY MR. HALLSTEN:

18   Q.   Okay.  And on that form it says, "Date discrimination

19   took place."  Earliest it says December 1st, 2006, correct?

20   A.   Yes.

21   Q.   Okay.  And latest was March 3rd, 2007, correct?

22   A.   Correct.

23   Q.   Okay.  Well, isn't it undisputed at this point that

24   Mr. Sullivan was out of the office from July of 2006 on?  He

25   wasn't even in the office in December 1st of 2006.

1    A.   Correct.

2    Q.   So your first charge -- your only charge to the EEOC in

3    this case specifically identifies a time period when Mr.

4    Sullivan wasn't even in the office, correct?

5    A.   Well, no, this was the earliest, the latest, on this

6    form, yes.

7              THE COURT:  Wait a minute.  Would you read the

8    question back again, please.

9         (Record read as requested.)

10   BY THE WITNESS:

11   A.   Correct.

12             MR. HALLSTEN:  Your Honor, may I have a moment?

13             THE COURT:  Certainly.

14             MR. HALLSTEN:  Thank you.

15             MR. HALLSTEN:  I believe that is all we have.

16             THE COURT:  Very well.

17             Redirect, Mr. Casson.

18             MR. CASSON:  Yes, your Honor.

19             MR. HALLSTEN:  Do you want to give me a minute to

20   get this out of here.

21             MR. CASSON:  You guys are going to have to leave

22   the exhibits up.

23             MR. HALLSTEN:  Okay.  We will leave them.

24             MR. CASSON:  Your Honor, I am going to use the

25   notes.  This has already been admitted into evidence.

1    THE COURT:  All right.

2                 REDIRECT EXAMINATION

3    BY MR. CASSON:

4    Q.   Kim, I want to direct your attention to this -- your

5    notes.  The date on here is May 19th, 2003.  What happened at

6    10:30 that day?

7    A.   We had a meeting.  We had a new provider that came in

8    that we contracted with to perform all of the treatment and

9    educational components at day reporting.  And this new

10   provider which was HRVI, we were meeting with them and we

11   were discussing all the interagency regulations and how we

12   were going to work together.

13   Q.   How long had Mr. Sullivan been on the job at this point?

14   A.   He -- I believe almost a year.

15   Q.   Had there been a prior provider prior to this date?

16   A.   Yes.

17   Q.   And the new provider had a -- did they have an executive

18   director or some representative there?

19   A.   Yes, they did.

20   Q.   And who was that?

21   A.   That was Mr. Edo (phonetic) and I believe Mr. Collins

22   was also there.

23   Q.   And during that meeting did you discuss what to do with

24   a tamper?

25   A.   Yes.

1   Q.   Was there a policy in place at the time?

2   A.   No, there was not.

3   Q.   Subsequent -- this is in 2003, correct?

4   A.   Yes, it was.

5   Q.   Now, advance to 2005, two years later.  The incident

6   with Spewack occurred?

7   A.   Correct.

8   Q.   Had there been any tampered cases in the two years and

9   four months since the May '03 meeting?

10  A.   Absolutely.  The policy always was it was a --

11  everything was done on a case-by-case basis.  If a

12  participant came into the program and was using narcotics and

13  wasn't progressing through the program and was caught

14  tampering with urine, they -- they would go back to DOC.  If

15  the participant came into the program and they had been using

16  drugs and they subsequently stopped using drugs based on the

17  rehabilitation, had active employment, and he was caught

18  doing this, he was given a consideration and -- based on the

19  fact that he was making progress through the system.  And

20  that was the policy.

21  Q.   And did Mr. Sullivan change that policy on May 9th of

22  2003?

23  A.   No, he did not.

24  Q.   You were shown this sexual harassment complaint form by

25  Mr. Hallsten.  The information on these lines, that is where

1   you would put what?

2   A.   You would put the circumstance, the day it happened, who

3   did it, what occurred, where and -- and when.

4   Q.   Okay.  And if you had to add information, what would you

5   do?

6   A.   You would use additional paper if you needed to.

7   Q.   Paper -- paper like that?

8   A.   Yeah, paper just like that.

9   Q.   And you can put additional facts and just attach it,

10  correct?

11  A.   That's correct.

12  Q.   One of the things you have to say is when it happened,

13  correct?

14  A.   Correct.

15  Q.   And on your letter you say here that is when it

16  happened?

17  A.   Correct.

18  Q.   Right?

19  A.   Yes.

20  Q.   And in your letter you say -- you also have to say who

21  it is about?

22  A.   Yes.

23  Q.   And right here you say who it is about?

24  A.   Yes.

25  Q.   And job title and department, you have to tell them who

1    that is too, right?

2    A.   Correct.

3    Q.   And you say that -- you are in the DRC, correct?

4    A.   Correct.

5    Q.   In the cover letter you clearly identified yourself,

6    correct?

7    A.   Yes, I did.

8    Q.   That is your signature at the bottom, right?

9    A.   That is -- yes, it is.

10   Q.   Now I want to direct your attention to the bottom of

11   this page, that number right there.

12   A.   Yes.

13   Q.   What does that refer to?

14   A.   That refers to the Inspector General's exhibit

15   attachment.

16   Q.   All right.  So this did get to the Inspector General?

17   A.   Yes, it did get to the Inspector General.

18   Q.   So that was the -- when you sent it to Mr. Gallagher,

19   what did you want to happen?

20   A.   I wanted it to get to the Sheriff's Department.  I

21   wanted it to get to the Sheriff.  I wanted somebody to do

22   something about what was going on in the department.

23   Q.   And it, in fact, did get to the Inspector General's

24   office, correct?

25   A.   Correct.

1    Q.   And did they ever do the investigation?

2    A.   No.

3    Q.   When you had -- were paid a visit by Mr. Pavalonis and

4    Mr. Cleary, did they ask you -- strike that.

5              Did they tell you what they were there for?

6    A.   Yes.

7    Q.   All right.  And when -- in describing what you were

8    there for, did they have a script or some set questions that

9    they had already typed out?

10   A.   Yes.

11   Q.   Was it in the IG's office?

12   A.   Yes, it was.

13   Q.   And they sat behind a computer and you sat on the other

14   side of the desk?

15   A.   Correct.

16   Q.   Were the questions in your statement -- you didn't

17   change any of those questions or draft any of those questions

18   ahead of time?

19   A.   No.

20   Q.   They already had them laid out?

21   A.   Yes.

22   Q.   So in the first part of your interview, did -- they

23   didn't ask you anything about sexual harassment investigation

24   or your complaint, did they?

25   A.   No, they did not.

1    Q.   In the second part of your interview they didn't ask you

2    any questions about the sexual harassment or your -- your

3    complaint, did they?

4    A.   No, they did not.

5    Q.   And you will -- I want to also direct your attention to

6    the bottom of the statement page.  There is also a CI number

7    at the bottom of that?

8    A.   Correct.

9    Q.   And that makes it -- that was part of the same file,

10   correct?

11   A.   Yes, it was.

12   Q.   That is -- 05-08-036 was the Spiewak investigation?

13   A.   Correct.

14   Q.   Now, that was the charge they brought against you,

15   correct?

16   A.   Correct.

17   Q.   Well, when you became the director of the -- of the day

18   reporting unit?

19            MR. HALLSTEN:  Objection, your Honor.  Misstates

20   the evidence.

21            MR. CASSON:  I am sorry, Judge.

22   BY MR. CASSON:

23   Q.   When you became the Acting Director of the day reporting

24   unit, did you receive the pay of the Director?

25   A.   No, I did not.

1  Q.   Did you do the job of the Director?

2  A.   Yes, I did.

3  Q.   Did you do the job of the Director and the Deputy

4  Director at that point?

5  A.   Yes, I did.

6  Q.   Did you get paid for both jobs?

7  A.   No, I did not.

8  Q.   To your knowledge, was -- Mr. Sullivan was still on the

9  payroll, correct?

10  A.   Correct.

11  Q.   He did -- when did it become apparent to you that he was

12  not on the payroll anymore?

13  A.   I never -- I didn't know if he was ever -- I wasn't

14  privileged to that information.

15  Q.   You don't know that he was ever taken off?

16  A.   No.

17  Q.   Up to the point that you were terminated in March, you

18  received your old salary, correct?

19  A.   Correct.

20  Q.   When Mr. Sullivan was in the office, were you in the --

21  this is prior to the end of July of '06 -- I am sorry -- yes,

22  of '06 -- correct?

23  A.   Yes.

24  Q.   Were you in his presence when he had any conversations

25  with Sally Campillo?

1    A.   Yes.

2    Q.   What were they?  What did he say?

3              MR. HALLSTEN:  Objection, your Honor.  Outside the

4    scope.

5              THE COURT:  Yeah.  Yes, it is.  Isn't it?

6              MR. CASSON:  It was inquired about.

7              THE COURT:  You objected.

8              MR. HALLSTEN:  Your Honor sustained the objection

9    and I moved on.

10             THE COURT:  Let me -- well, I will let you reopen

11   the proofs.  You can conduct further cross-examination on it.

12             MR. HALLSTEN:  Okay.  Thank you.  Your Honor.

13             THE COURT:  Lay a foundation.

14   BY MR. CASSON:

15   Q.   Where did the discussion occur?  Where were you?

16   A.   In his office.  In the Director Sullivan's office.

17   Q.   This is in the -- was anybody else there?

18   A.   No.

19   Q.   Who else was in attendance?

20   A.   It was me and Director Sullivan and Investigator

21   Campillo.

22   Q.   Okay.  What did -- why was Sally there, Miss Campillo?

23   A.   Because she was complaining about her supervisor, Chief

24   Rodriquez.

25   Q.   And when was this?  What year?

1    A.    It was in 2006.

2    Q.    What month?

3    A.    I believe it was early July of 2006.

4              MR. HALLSTEN:  Objection, your Honor.  Relevance at

5    this point.

6              THE COURT:  Overruled.

7    BY MR. CASSON:

8    Q.    What did he say to her?

9    A.    He told her to quit putting stuff on paper.  He said --

10   he said she needs to quit putting documentation on paper and

11   sending it to the IG.

12   Q.    Did he ever refer to her in any vulgar manner?

13   A.    Yes.

14   Q.    And when was that?

15   A.    That is the same time.  And one other time when she was

16   in the office with me he asked me what that B was doing in

17   there.

18             THE COURT:  Wait.  This was all the subject of

19   direct examination.  She related two phone conversations in

20   Mr. Sullivan's office in 2006.  The second one was with Sally

21   Campillo present.

22             MR. CASSON:  I am sorry, I thought there was an

23   objection to that.

24             THE COURT:  That was all one into on direct exam.

25             MR. CASSON:  That is all I have, Judge.

1    THE COURT:  Okay.  Anything further?

2    MR. HALLSTEN:  Yes, your Honor, briefly.

3    RECROSS EXAMINATION

4  BY MR. HALLSTEN:

5  Q.   Did you -- Miss Passananti, did you report this

6  allegation that Sullivan told her to stop -- told

7  Miss Campillo to stop putting things on paper?

8  A.   No.

9  Q.   Did you fill out a complaint form and send it to the IAG

10  saying Mr. Sullivan is threatening an employee -- actually a

11  supervise -- a person that you supervised, correct?

12  A.   Correct.

13  Q.   You did not report that one of your employees was

14  allegedly threatened by Mr. Sullivan, correct?

15  A.   Correct.  She did.

16  Q.   Now, Mr. Casson just showed you some information on the

17  sexual harassment complaint form, correct?

18  A.   Correct.

19  Q.   And asked you if it was in your letter, correct?

20  A.   Correct.

21  Q.   Now, what Mr. Casson didn't ask you is -- you see that

22  big word at the top.  Where is that word in your letter,

23  sexual harassment.  Where is that in your letter, Miss

24  Passananti?

25  A.   It was defined in the letter.

1    Q.   Where were the words "sexual harassment" or -- where was

2    the word "sexual harassment" in your letter?

3    A.   That isn't a requirement to report --

4         THE COURT:  Would you answer the question, please.

5    It is getting late.

6         THE WITNESS:  No, your Honor.

7    BY MR. HALLSTEN:

8    Q.   Where is the word "complaint" in your letter?

9    A.   The word is not in there.

10   Q.   Now, it is unequivocal to anybody receiving this form

11   that the nature of this form is a sexual harassment complaint

12   being registered by the person submitting it, is that

13   correct?

14        MR. CASSON:  Objection.  Form of the question,

15   Judge.

16        THE COURT:  Overruled.

17   BY MR. HALLSTEN:

18   Q.   Is that correct, Miss Passananti?

19   A.   Correct.

20   Q.   And that complaint form is what is required by the

21   policy that you are -- that you know better than anybody else

22   in the Sheriff's Office, correct?

23   A.   You can also give a verbal complaint.

24        THE COURT:  Could you answer the question, please.

25   BY THE WITNESS:

1  A.   No.

2  BY MR. HALLSTEN:

3  Q.   You already testified that that complaint form is the

4  complaint form attached to the General Order, Miss

5  Passananti, is that correct?

6  A.   That's correct.

7  Q.   Okay.  And this complaint form contains the word "sexual

8  harassment complaint," correct?

9  A.   Yes.

10 Q.   And your letter does not?

11 A.   No.

12           MR. HALLSTEN:  Thank you.  No further questions.

13           THE COURT:  Anything further, Mr. Casson?

14           MR. CASSON:  No, your Honor.

15           THE COURT:  You may step down.  Thank you.

16      (Witness excused.)

17           THE COURT:  Well, ladies and gentlemen, it is

18 getting late.  Why don't we break for tonight.

19           We are off the record.

20      (Discussion held off the record.)

21      (Proceedings adjourned at 4:40 o'clock p.m.)

22

23

24

25